William L. COX and Florence R. Cox,
Respondents,

v.

Charles E. JONES and Myrle H. Jones,
Appellants,

Phillip E. King, Alan F. Wherritt, Trustee,
Defendants,

Ted E. Dyer and Virginia Lee Dyer,
Intervenors, Respondents.

Charles E. JONES and Myrle H. Jones,
Appellants,

v.

Sydney O. SCHROEDER and Margaret L. Schroeder, William L. Cox and Florence Cox, Fred Koenigsberg and Erma F. Koenigsberg, Ted E. Dyer and Virginia Lee Dyer, Arthur Kincaid, Trustee, and Alan F. Wherritt, Trustee, Respondents.

No. 51882.

Supreme Court of Missouri,
Division No. 2.

Dec. 12, 1966.

Opinion Modified Feb. 13, 1967.

Motions for Rehearing or for Transfer to
Court En Banc Denied
Feb. 13, 1967.

Motion for Rehearing or for Transfer to Court En Banc, Responsive to Modification of Opinion on Feb. 13, 1967, Denied March 13, 1967.

Thomas M. Sullivan, Downey, Sullivan & McCormick, Kansas City, for appellants.

Paul C. Dugan, Kansas City, for plaintiffs-respondents.

Conn Withers, Liberty, for respondents-intervenors.

PER CURIAM.

This is principally a suit for dissolution of a partnership between two physicians and for accounting. The basic issue is that of which physician was the "withdrawing partner" so as to make applicable a provision of paragraph 11 of the written agreement (dated April 1, 1962) below set forth.

We have appellate jurisdiction by reason of Dr. Jones' claim from Dr. Cox of $19,962.51; and also by reason of intervenors' (Dentist, Dr. Dyer, and wife) claim to contractual restrictive rights and pre-emptive rights concerning title to a medical building and parking lot where the parties practiced their professions in Liberty, Missouri. Appellant also had filed a suit in partition of his claimed interest in the real estate, which suit was consolidated herein, which partition claim was denied by the trial court.

The trial court concluded that Dr. Jones by his acts and conduct and by his announcement of withdrawal made on or about August 25, 1963, terminated the partnership on October 1, 1963, and became the withdrawing partner within the meaning

of the partnership agreement; that Dr. Cox is the owner of the partnership accounts receivable in existence on October 1, 1963, and the collection therefrom; that Drs. Cox and Jones each have an undivided one-half interest in the accounts receivable from October 1, 1963 to February 15, 1964; that Dr. Cox is entitled to rents collected for partnership assets (rented to one Dr. Phillip E. King) subsequent to February 15, 1964; that Dr. Cox is indebted to Dr. Jones for a $900 error in computing the value of his interest in the parking lot purchased by the partnership; that Dr. Cox is obligated to purchase Dr. Jones' capital investment at book value ($6,370.22) in cash or over a 5-year period in equal monthly installments with 5% interest per annum; that Dr. Jones and wife have no interest in partnership assets; that Dr. Jones is entitled to recover from Dr. Cox amounts paid by him from personal funds on a Koenigsberg note and a Schroeder note (mortgagees) subsequent to February 15, 1964; that Dr. Cox is entitled to recover from Dr. Jones the unpaid balance of Dr. Jones' notes (originally $1,970.20 and $3,-272.71, representing one half of the equity value of furniture, fixtures and cash, and one half of the real estate equity values, furnished by Dr. Cox at the outset of the partnership). It was further concluded that further accounting would be required to determine the balances due on the Koenigsberg and Schroeder notes, the status of accounts receivable between April 1, 1962 and October 1, 1963, and those arising under the "de facto" partnership from October 1, 1963 to February 15, 1964; the status of receipts and disbursements on the medical building and adjacent property from February 15, 1964 to the present time; and payments, offsets and credits, if any, on notes executed by Dr. Jones to Dr. Cox.

With respect to intervenors, Dr. Dyer and wife, the trial court found and declared they were entitled to enforce a recorded contract (pre-emptive agreement and option) to acquire the undivided 35% real estate interest of the partner (and wife) found to be the withdrawing partner (Dr. Jones), said pre-emptive right to be executed by Dyers within 30 days after this judgment becomes final, at a purchase price of $8,374.42, less depreciation from October 1, 1963. The judgment entered was declared to be a final order for purposes of appeal.

Dr. Cox began his practice of medicine in Liberty, Missouri, as an associate of Dr. Sydney O. Schroeder, M.D., at a salary of $500 per month. At that time Dr. Dyer had his dental offices in the medical building, owning with his wife, an undivided 30% thereof. On December 31, 1956, Drs. Schroeder and Cox made a written partnership agreement pursuant to which one half of Dr. Schroeder's interest in the building was conveyed to Dr. Cox and wife. This partnership was dissolved by written agreement on June 30, 1960, and Dr. Cox acquired by note for $10,235.50 Dr. Schroeder's one half of the then accounts receivable at about 55% of total value. Thereafter, Dr. Cox practiced his profession alone, except for two months when he had an associate, and for six months when another physician shared office space.

Then on July 17, 1961, Dr. Jones, who had completed his residency at St. Luke's Hospital, Kansas City, Missouri, came to Liberty as an associate to Dr. Cox at $1,-000 per month. The employment contract recited that it c .emplated at its completion a partner..ip. That agreement was consummated on April 1, 1962, in writing. At that time, Dr. Cox (and wife) had a record title to an undivided 35% of the medical building. Dr. Schroeder owned 35%, and Dr. Dyer owned 30%. The agreement between Dr. Cox and Dr. Jones recited that the Coxes owned 7/10, but actually the 35% interest conveyed to Dr. Jones and wife came from Dr. Schroeder. The agreement between Drs. Cox and Jones provided that Jones was to pay $1,470.21 for the one-half interest in personal property and equipment, and $3,272.71 for the Cox equity (35%) in the real estate, both

figured at book value (cost less depreciation). There was also added to the note $500 advanced by Dr. Cox as Dr. Jones' one half of a starting bank account. The note bore interest at 4% per annum and was payable in monthly installments, chargeable against the withdrawal account of Dr. Jones. Dr. Cox also paid Dr. Jones $336.87 for one half of the book value of equipment which Dr. Jones brought with him.

At the time Dr. Jones became a partner, Dr. Cox' medical practice included some obstetrics, pediatrics and internal medicine, minor surgery and assisting in general or major surgery as well as a 15 or 20 per cent allergy practice. Dr. Jones undertook general practice with no allergy practice.

On May 28, 1962, Dr. Cox had a coronary thrombosis for which he was hospitalized to June 16 or 17, 1962. He then returned home for a period of convalescence, returned to part-time practice (10:00 a. m. to 2:00 p. m.) on August 16, 1962 until September 1, 1962, at which time he resumed full-time practice. During the illness and convalescence, Dr. Jones took care of all the practice, but starting in July, 1962, a modification in the partnership agreement was made in that Dr. Cox received $1,400 per month and Dr. Jones received the balance. On returning to full-time practice the then percentage of net profits was resumed: 60% to Dr. Cox; 40% to Dr. Jones, which continued to December, 1962. At that time a written amendment was made so that each partner thereafter was to receive 50% of the profits rather than wait until April 1, 1964, as provided in the original agreement.

After January 1, 1963, the relations between the partners seemed pretty good up to March 21, 1963, when Dr. Jones offered certain amendments or changes in the partnership agreement, but to which the parties were not able to agree. Dr. Jones wanted the doctor who took less days off per year to be compensated therefor; to delete the provision for note payments to be charged against his withdrawal account; a different provision for disability; decrease of office personnel when one partner was out for any reason; and to delete the forfeiture provision above alluded to if Dr. Cox terminated the partnership before April 1, 1964. Thereafter Dr. Jones complained about Dr. Cox taking too much time off and devoting too much time to his allergy practice (of which he did more than before his coronary attack).

On Sunday afternoon, August 25, 1963, Dr. Jones informed Dr. Cox orally that he was going to leave Liberty after September 30—that is, he was going to be gone October 1, 1963, to Kansas to practice medicine. The reason given was that he liked the Kansas school system better and Mrs. Jones did not like Liberty. Dr. Cox told Dr. Jones that he would have to tell Mrs. Reed (the office receptionist) so she would know how to book patients—not to book any more patients. (Mrs. Reed testified that Dr. Jones told her not to schedule any more obstetric patients for him after October 1, 1963, that he was leaving.) Dr. Cox then went to San Francisco and returned August 30, 1963, at which time he talked with interns or residents at General Hospital who would be available for joining a general practice in Liberty. When he returned to Liberty he learned that Dr. Jones was not leaving as of October 1, 1963, but had patients scheduled for that month, about which Dr. Cox asked Dr. Jones who replied that he was not going to be leaving then, he had changed his mind.

Dr. Cox thereafter pressed Dr. Jones at every opportunity, asking "When are you going to leave?" Dr. Jones would not give him an answer. Dr. Cox testified that "Then we continued our practice of medicine." Dr. Cox could not get a definite date as to when Dr. Jones was going to remove himself from Liberty, so he decided that he should remove himself "since he (Jones) had already dissolved the partnership." On November 9, 1963, Dr. Cox

wrote Dr. Jones the following letter (Plaintiffs' Exhibit 13):

"C. E. Jones, M.D.,
101 W. Kansas,
Liberty, Missouri.

"As you know, we signed a written agreement for the partnership-practice of medicine April 1, 1962. You are also aware of the fact that these terms were discussed prior to its construction, and you signed this contract without influence or encouragement on my part.

"On May 28, 1962, I was hospitalized because of Coronary Thrombosis until June 17, 1962. On June 27, 1962, you visited me in my home for the purpose of leaving insurance papers for my signature. On this date you registered your first complaint to me that you felt you were overworked for the compensation you were receiving. On July 3, 1962, I offered you all the cash receipts from the income from our 'partnership' except for my usual withdrawal salary of $1400.00 per month. As you know, Dr. Jones, this offer on my part was strictly a generousity, in as much as such a situation had been considered during the original construction of our partnership agreement. The partnership agreement was so constructed that either you or myself would be protected in the event of an emergency requiring absence from office participation. Remember, this contract was made for your benifit as well as mine.

"In September 1962, you again complained that you felt your share of the undivided profit was not commensurate with your effort. Again may I remind you that these percentages of the undivided profits were described and agreed to by yourself in the original agreement. An equal share of the undivided profits was given to you for a Christmas present in 1962 in as much as your contentment seemed to depend largely upon your monetary gain.

"In March 1963, new demands were made on your part to 'delete' certain parts and paragraphs of the amended contract.

"Please bear in mind, Dr. Jones, that all the giving has been on my part, and the receiving has been on your part. You have incicated discontentment to our employees that I have been taking more time from our practice than has been allowed. Time off for vacation and post graduate education was part of the original agreement.

"On August 25, 1963, you made known to me your plans to separate yourself and family and move to the state of Kansas for residence and the practice of medicine. You stated that your move would be effective October 1, 1963. Since that time you have changed your time of leaving and have avoided stating a positive date. You have avoided discussion both with me and with our mutual advisors, Professional Management Midwest. This is also contradictory both to your partnership agreement, your statement of August 25, 1963, and any personal or professional loyalty. I feel that you owe me at least this courtesy so that I can best plan for your replacement and the replacement of Mrs. Stowell until she is able to return to her job.

"In closing, let me say how deeply disappointed I am at your tactless, untimely ultamatums made during my near and progressive convalescent period following my arrival home June 17, 1962. At that time you indicated very clearly that your written word was both undependable and insincere. It is my hope and wish that your word, both verbal and written, is given with more meaning and sincerity in your future associationships.

"In the medical profession, the spoken word is as binding as the written word, therefore, according to paragraph 11 of our original agreement, may I have your withdrawal date from our partnership as December 31, 1963. This date being based upon your oral statement August

25, 1963, that you would be departed, October 1, 1963.

"If you decide to defer your date of said withdrawal, please be informed of my withdrawal from the partnership of William L. Cox, M.D.,-Charles E. Jones, M.D., as of February 15, 1964.

William L. Cox, M.D.<br>/s/ William L. Cox MD."

By printed letter dated February 6, 1964 (Dr. Cox testified it was erroneously dated and was sent out about a month earlier), Dr. Cox notified his friends and patients that he would close his offices in Liberty on February 15, 1964, and would open a new office at 1212 West Truman Road, Independence, Missouri, on February 17, 1964, solely for the treatment of asthma, hay fever and other allergic diseases. By the fourth paragraph of this letter, Dr. Cox advised his patients: "As you are aware, Dr. Jones is a capable physician. I have always felt that your health and safety have been well guarded by him when my absence has been necessary. It is my wish that you will continue to let him care for you in the future as you have allowed me this privilege in the past."

On cross-examination, Dr. Cox testified that in October, 1963, November and December, 1963, January, 1964, and to some extent in February, 1964, Dr. Jones devoted full time to the operation of the partnership practice of medicine. The following figures relate to the partnership activities (the net profits divided 50–50) during this period of time:

| | Partnership Business Done | Expenses |
|---|---|---|
| October, 1963 | $10,161.50 | $2,953.03 |
| November, 1963 | 8,329.50 | 2,838.54 |
| December, 1963 | 9,329.50 | 3,290.92 |
| January, 1964 | 8,530.00 | 2,844.20 |
| February, 1964 | 611.00 | 1,525.08 |

After February 20, 1964, Marvin J. Weishaar, a Certified Public Accountant in Liberty, at the request of Drs. Cox and Jones, collected $16,309.45 paid by patients on accounts and deposited the same in the National Commercial Bank of Liberty to await the outcome of this suit. $12,979.88 was collected by him and deposited to August 15, 1964, with no disbursements being made at any time.

After October 1, 1963, Dr. Cox made no tender or offer of the book value to Dr. Jones for the building and equipment of the partnership. Shortly after February 15, 1964 (on March 13, 1964), Dr. Jones made a demand upon Dr. Cox to convey his interest in the building and fixtures based upon book value. After October 1, 1963, up to February 15, 1964, Dr. Cox continued his drawing account—the full percentage to which he was entitled.

There was an amount of $8,444.20 owed by Dr. Cox to Dr. Schroeder on the previous accounts receivable as of April 1, 1962 (the original amount was $10,235.50 for Dr. Schroeder's one-half interest therein). On March 31, 1962, Drs. Cox and Jones and wives executed a new note to Dr. Schroeder for the $8,444.20, with provision that $85.30 be paid thereon by Dr. Jones monthly as a charge against his drawing account. (Apparently, this $85.30 was one half of a principal payment on the note to Dr. Schroeder, which with interest was paid from partnership funds in a total amount of approximately $229.00 per month, but we cannot tell from this record the source of such payments. We note that the trial court reserved this item for further accounting between these physicians.) The old accounts (previously due Dr. Cox) were not on that date or thereafter separated on the part-

nership books from those accumulated by the Cox-Jones partnership, but Dr. Jones began receiving immediately his proportionate share of all accounts receivable as paid by patients.

Dr. Jones' version of the events preceding the final parting of the parties is that at the outset he told Dr. Cox he wanted nothing to do with the old accounts receivable—he did not specifically remember signing the $8,444.20 note, but probably did so. The accounts receivable on April 1, 1962, consisted of some that Dr. Cox had put on the books himself, and some that had been put on the books for a number of years—that Dr. Schroeder had accrued. (The accounting firm, Professional Management Midwest, showed the total of $45,-278.32 as of April 1, 1962.)

After Dr. Cox' heart attack, he was away from the office for three months and Dr. Jones practiced alone. Thereafter, Dr. Cox' practice became more concerned with allergy practice than with general medicine. This put more burden on Dr. Jones in that he was doing more obstetrical work; seeing more emergency patients; and doing more night and weekend work.

In September, 1963, Dr. Jones went to Dr. Cox' home and told him he had decided to leave the partnership. He discussed the problems they had and told Dr. Cox there didn't seem to be any solution, and he believed they would be better off dissolving the partnership. Dr. Cox asked Dr. Jones if he were leaving before October 1, to which he answered that he was not. He didn't know because he had no plans at that time. Dr. Jones did not ever tell Dr. Cox that he was going to leave on a certain day.

After Dr. Cox sent Dr. Jones the letter of November 9 (above set forth), Dr. Jones stopped by his office to talk to him about it and told him that he thought it was a threat—trying to get him to leave before the April 1st dating on the partnership agreement. He further told Dr. Cox that he was not leaving before April 1, and that

he could go ahead and dissolve the partnership as he had written in his letter.

In the fall of 1963, Dr. Jones requested the receptionist, Mrs. Reed, to take no more new obstetrical patients for him. The reason given by Dr. Jones for this request was that he planned to leave the partnership April 1, and would not have time to deliver any new obstetrical patients before then.

In February, 1964, Dr. Jones contacted Dr. Phillip E. King and made arrangements to rent him the building (70%) for $600 per month, to be paid into an escrow account. Dr. Jones, after October 1, 1963, gave to Dr. Bradford at Overland Park, Kansas, a $1,000 check as a deposit on some equipment in that office which he was planning to go into after April 1, 1964.

On cross-examination, Dr. Jones testified that in the middle of 1963 he became aware that monthly payments were being made to Dr. Schroeder on the $8,444.20 note from the partnership accounts. Dr. Jones protested to Dr. Cox and reminded him that originally he told him he didn't want any part of his accounts receivable (a 60–40 per cent of collections of which he shared at the outset, the total amount of which was then $39,035.61). Dr. Jones determined from what was reported by a collections attorney that $15,555.22 of $45,793.90 accounts receivable (old and new) existing on February 15, 1964, was uncollectible.

Dr. Jones denied practicing medicine in Overland Park, Kansas, prior to February 15, 1964, but testified he could have paid an application fee to the Eugene Bryan Realty Company of Kansas prior to November 9, 1963, and that he did deal with the Kansas architectural firm of Boyle and Wilson.

Paragraph 7 of the partnership agreement of April 1, 1962, provided that first parties (Dr. Cox and wife) sell and agree to convey to Dr. Jones an undivided 35% interest in the real estate, "subject to all the terms and conditions of partnership agreement dated August 30, 1954, by and between Ted E. Dyer and Virginia Dyer, his wife,

and Sydney O. Schroeder and Margaret L. Schroeder, his wife, which said agreement is of record in Book 511 at page 611 of the deed records of Clay County, Missouri." Paragraph 5 of this latter agreement provided that "the sale or lease of all or any part of the parties' respective interest in said real estate shall be subject to the reasonable approval of the opposite party and no sale of either of the parties' interest therein shall be made without giving the opposite party at least 30 days within which to meet the bid of the proposed buyer thereof." Paragraph 6 thereof provided, "In the event either of the parties hereto should desire to sell all of said real estate, for the purpose of partitioning the proceeds therefrom, the opposite party shall have the opportunity, if so desired, to purchase the interest of the party desiring to sell, and if agreement can not be reached as to the value of such interest the price thereof shall be fully and finally determined by 3 appraisers, one to be selected by each of the parties hereto and such appointees to thereafter select the third appraiser." Paragraphs 11 and 12 of the Cox-Jones partnership provided as follows:

"11. This agreement shall continue in effect until the death of one of the parties or until dissolved by mutual agreement or by the giving of one partner to the other of thirty (30) days' written notice of his intention to terminate the partnership agreement. If either party withdraws from the partnership business as herein provided, such withdrawing partner's capital investment, including real estate, will be purchased at book value, that is, cost less depreciation, excluding accounts receivable, which shall be frozen and all collections made in such accounts within the following six (6) months will be distributed at the then existing percentages. At the end of this period, all accounts become the property of the remaining partner. Said purchase may be in cash or over a five (5) year period in equal monthly installments with interest at the rate of five per cent (5%) per annum.

Should second party terminate the partnership before April 1, 1964, all accounts receivable shall be the sole property of first party.

"12. The withdrawing partner shall sell his interest in the real estate herein described to the remaining partner or to some person or persons satisfactory to the remaining partner. If the parties cannot agree upon the reasonable value of said real estate, the same shall be determined by three appraisers, one to be selected by each party and the two so chosen to select a third appraiser."

■ Although our rules provide that our review in an equity case such as this requires that the judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses, Civil Rule 73.01(d), V.A.M.R., § 510.310, RSMo 1959, V.A.M.S., our review is in nature de novo, where we make our own findings of fact, weigh the evidence relating thereto, and reach our own conclusions. Hogan v. Krohn, Mo., 318 S.W.2d 163, 167 [1]. Here, there is little disagreement as to the facts surrounding the parting of the partners in this venture in the medical practice. Dr. Cox testified that in August, 1963, Dr. Jones told him (orally) that he would be leaving on October 1. (Dr. Jones testified that he was not leaving October 1, 1963, or on any certain day, because he had no plans.) The difficulty arises with the undisputed facts of what happened thereafter. Dr. Cox did not then, or as of October 1, 1963, treat the partnership as dissolved, with no more association between the partners. Nor did Dr. Jones. Rather, Dr. Cox took a trip to San Francisco, returning August 30, 1963. The most that he did was to talk with interns or residents at General Hospital as to their availability for joining a general practice in Liberty. This inquiry was apparently fruitless; at any rate the record is devoid of any evidence that Dr. Cox changed his position in reliance upon Dr. Jones' oral statement

or that he brought home to Dr. Jones any acceptance of the oral termination before Dr. Jones retracted it. When Dr. Cox returned, there was apparently a retraction of Dr. Jones' oral withdrawal before his stated effective date thereof. Dr. Jones had changed his mind. The parties thereafter continued as partners under their written arrangements as before. Dr. Cox did not insist that Dr. Jones' oral termination date was effective. Each physician continued to practice medicine as before. There was no new "de facto" partnership relation created. The parties continued devoting their time to their professions (albeit strained in their personal relations), paying expenses, and sharing the net profits. Compare the statutory provisions of the Uniform Partnership Law, § 358.230, RSMo 1959, V.A.M.S., providing that where a continuation of a partnership beyond a fixed term or particular undertaking is had the rights and duties of the partners remain the same, and that the continuation of the business by the partners, without any settlement or liquidation of the partnership affairs, is prima facie evidence of a continuation of the partnership. "Where a partnership contract provides that if one partner should 'want' the partnership dissolved before a certain date he shall lose all his interest as a partner, the partnership is not dissolved by his mere expression of a desire to dissolve where no affirmative action is taken by the other partner, either by notice or abandonment, and the activities of the partnership continue." 68 C.J.S. Partnership § 332, p. 845; and see the there cited case of Rubens v. Rubens, 101 Wash. 675, 172 P. 831, 832 [1, 2], so holding. The partnership here continued up to February 15, 1964, when these physicians physically severed their professional relations.

██ ██ The letter of November 9, 1963, from Dr. Cox to Dr. Jones, which we have set forth in detail above, has no legal significance except as a *written* notice of partnership termination by Dr. Cox effective February 15, 1964. It is clear that as of the date of the letter the partnership had not been dissolved by Dr. Jones' acts or conduct as of October 1, 1963. The record shows only that he withdrew his oral notice of dissolution before it was acted upon (accepted) by Dr. Cox. This Dr. Jones could do as is elementary in contract law. Sokol v. Hill, Mo.App., 310 S.W.2d 19; 17 C.J.S. Contracts § 50, p. 706. Dr. Cox testified that Dr. Jones told him he had changed his mind *before* the oral termination date of October 1, 1963. It thus appears from all the evidence that Dr. Jones was not the withdrawing partner as of October 1, 1963. Dr. Cox' letter of November 9 could not have the effect of forcing Dr. Jones to give a notice and become a withdrawing partner (before April, 1964) and thus work a forfeiture of his interest in the accounts receivable, in accordance with paragraph 11 of the April 1, 1962 partnership agreement. On this record we can conclude only that by the November 9, 1963 letter, Dr. Cox became the withdrawing partner as of his own termination date, February 15, 1964. It is pursuant to that notice that the trial court must act on Dr. Cox' petition for dissolution of partnership and the winding up of its business affairs under § 358.320, RSMo 1959, V.A.M.S. The result which we reach is that Dr. Jones does not forfeit his interest in the accounts receivable, but under the terms of these parties' agreement, each partner must share equally in all the accounts receivable for six months after February 15, 1964 ($12,979.88 collected to that date by escrow holder Weishaar), after which the remaining accounts and collections thereon are the property of Dr. Jones.

We determine next whether intervenors Dr. Dyer and wife are entitled to enforce their "pre-emptive agreement and option" as recorded and described and referred to in the Cox-Jones partnership agreement as to what was denominated by the trial court as Tract 1 (the medical building and land). The partnership agreement does not describe or refer to the adjoining parking lot, acquired by Drs. Dyer, Cox and Jones on April 19, 1962, after the April 1 partnership agreement, and which was denominated as

Tract 2 by the trial court. It is intervenors' position (their Point IV) that the "Conduct of the Parties, Cox-Jones-Dyer in re the Parking Lot (Tract No. 2) of Decree Brought the Same Within the Purview of the Pre-Emptive Rights of Intervenors." We rule that intervenors' position is well taken. The parties treated the parking lot [acquired by the joint efforts of Drs. Cox and Dyer at the outset of the partnership, about April 1, 1962, but the deed to which (April 19, 1962) ran also to Dr. Jones and wife] as appurtenant to the medical building and land. The interests were the same— 30% Dr. Dyer and 70% Drs. Cox and Jones. The parking lot was included at a $6,000 value in the report of Professional Managers Midwest dated March, 1962, which was the method used to arrive at the amount of the note to Dr. Cox by Dr. Jones (the building portion being $3,272.71). Dr. Jones is the only person now urging the point that Tract 2 was not included in intervenors' recorded instrument, but he himself so regarded it, as the evidence shows, in his attempts to negotiate a settlement with Dr. Cox.

 Dr. Jones and wife here contend that the Dyer pre-emptive agreement and option does not extend to the partnership land (both Tracts 1 and 2), and that Dr. Jones did not agree or covenant to "reinstate the Dyer-Schroeder agreement." Dr. Jones cites Hall v. Morgan, 79 Mo. 47, and 37 Am.Jur. § 998, p. 325, but those authorities refer to deeds "subject" to existing mortgages, wherein it is held that no contractual obligation to pay the mortgage arises absent an express assumption and agreement to pay it. Thus, different facts govern the case at bar. Intervenors correctly proceed on the theory that their rights are governed by the law of third party beneficiaries to contracts. See Handlan-Buck Company v. State Highway Commission, Mo., 315 S.W.2d 219, where it was alleged that the City of St. Louis and the State Highway Commission had (pursuant to an ordinance) entered into a contract to leave a certain street open, which contract

was held (loc. cit. 315 S.W.2d 222 [3] [4]) to be for the benefit of plaintiff. See also Crow v. Kaupp, Mo., 50 S.W.2d 995; Allen v. Globe-Democrat Publishing Company, Mo., 368 S.W.2d 460. Intervenors are directly benefitted by the partnership agreement provision in that they have the right to purchase the interest of the withdrawing partner, whom we have determined to be Dr. Cox, and they are entitled to enforce it as to both tracts of land here involved at the price agreed to by Drs. Cox and Jones in their partnership agreement, i. e., cost less depreciation (book value).

What we have said disposes of the basic contentions of the parties. No points are made with respect to mathematical computations of the trial court.

 As to Dr. Jones' contention that he is entitled to a credit of one half of the $8,444.20 note to Dr. Schroeder on the ground that such one half is Dr. Cox' personal obligation, and that the same is without consideration, we deem that the parties are joint obligors on this note; that Dr. Jones' liability thereon is one half, for which he was to receive (ultimately) one half of existing accounts receivable on April 1, 1964. Any claim by Dr. Cox over and above such one half would be without consideration, but we rule further that the contention of error in the denial of Dr. Jones' claim to one half the original amount of this note is without merit. As noted, the trial court retained jurisdiction to ascertain by further accounting the source of credits on the Dr. Schroeder note. Thus, the respective liabilities of the parties may be settled as to the Schroeder note.

The following findings, conclusions and judgment of the trial court are reversed: That Dr. Jones is the withdrawing partner and Dr. Cox is the owner of the partnership accounts receivable on October 1, 1963, and the collections therefrom; that Drs. Cox and Jones each have an undivided one-half interest in the accounts receivable from October 1, 1963 to February 15, 1964; that Dr. Cox is entitled to rents collected

for partnership assets (rented to Dr. Phillip E. King) subsequent to February 15, 1964; that Dr. Cox is obligated to purchase Dr. Jones' capital investment at book value ($6,370.22) in cash or over a five-year period in equal monthly installments with 5% interest per annum; that Dr. Jones and wife have no interest in partnership assets; that Dr. Jones is entitled to recover from Dr. Cox amounts paid by him from personal funds on a Koenigsberg note and a Schroeder note subsequent to February 15, 1964.

The case is ordered remanded for further proceedings and entry of our following findings, conclusions and portions of the final judgment upon full accounting had: That Dr. Cox is the withdrawing partner; that each partner (Dr. Cox and Dr. Jones) is entitled to one half of the collections of the partnership accounts receivable for six months after the February 15, 1964 dissolution date given by Dr. Cox (to August 15, 1964); that, thereafter, Dr. Jones is the owner of the remaining uncollected accounts receivable and Dr. Cox has no interest therein; that Dr. Dyer and wife, intervenors, are entitled to enforce their pre-emptive agreement and option to purchase the interest of Dr. Cox and wife in all the partnership real estate (Tract 1, the medical building and land; Tract 2, the parking lot) at a purchase price of $8,374.42, less depreciation from October 1, 1963, within thirty days after this judgment becomes final; that Dr. Jones and wife are tenants in common with Dr. Dyer and wife and Dr. Cox and wife in said real estate (until such time, if so, that Dr. Dyer and wife exercise said pre-emptive agreement and option to purchase Dr. Cox' interest therein); that in the event Dr. Dyer and wife fail to exercise their options to purchase the interest of Dr. Cox in said real estate, Dr. Jones is obligated to purchase Dr. Cox' interest therein and his interest in the partnership personal property at book value as determined by the court; that the partition suit by Dr. Jones and wife seeking to partition their undivided interest in the real estate as against the owners of the remaining undivided interest therein is ordered reinstated and Dr. Dyer and wife shall be given the right and opportunity therein to assert and to have adjudicated their rights, if any, under the terms of the Dyer-Schroeder contract dated August 30, 1954, and recorded in Book 511 at page 611 of the deed records of Clay County, Missouri.

In all other respects the findings, conclusions and judgment, and the order for further accounting to ascertain the source of payments on the $8,444.20 note to Dr. Schroeder, the Koenigsberg and Schroeder mortgages (liens on said real property) are affirmed.

### On Motion for Rehearing

Intervenors, in a motion for rehearing, contend that by permitting reinstatement of the Jones partition petition we act in derogation of pre-emptive rights of intervenors. They recognize that we have provided, as indeed we did, an opportunity for them to exercise pre-emptive rights to purchase the 35 per cent interest of Cox as the withdrawing partner pursuant to the provisions of paragraph 11 of the Cox-Jones contract dated April 1, 1962. What they complain of is that this court has not adjudicated their asserted pre-emptive right to acquire the 35 per cent interest already vested in Jones, whom we have determined to be the surviving partner.

We consider it neither feasible nor appropriate on the record before us to determine the asserted pre-emptive right of intervenors to purchase the 35 per cent interest which Jones owns and continues to hold as the surviving partner. The right of intervenors to purchase this interest necessarily rests on paragraphs 5 and 6 of the original Dyer-Schroeder agreement. The record before us does not disclose whether intervenors are asserting a right to purchase pursuant to paragraph 5 or paragraph 6 of that agreement. It does not sufficiently disclose the position of Jones

with respect to alleged rights of intervenors under those provisions, and on the record before us we cannot determine the relief to which intervenors may be entitled.

We have not undertaken to determine any right of intervenors under the Dyer-Schroeder contract to buy the interest of Jones as the surviving partner. We do not intend by our opinion to cast any doubt thereon or express any view with respect thereto. We have not determined that Jones is entitled to partition. That is for the trial court to determine. We merely have reinstated his petition and hold that if he desires to proceed with the sale of his interest (which is what he seeks to do by partition), intervenors shall have the opportunity to assert rights with reference thereto based on the Dyer-Schroeder agreement and to have those asserted rights adjudicated if not acquiesced in by Jones.

In view of the foregoing, the motion of intervenors-respondents for rehearing or, in the alternative, for transfer to court en banc is overruled.