Charles R. WILLMAN, Appellant-Respondent,

v.

Edward M. BEHELER, Respondent-Appellant.

No. 57352.

Supreme Court of Missouri, Division No. 2.

May 14, 1973.

Motion to Modify Opinion Sustained and Modified June 11, 1973.

R. A. Brown, St. Joseph, for appellant-respondent.

O. W. Watkins, Jr., St. Joseph, for respondent-appellant.

HOUSER, Commissioner.

Suit in equity filed by Dr. Charles R. Willman to enjoin his former partner, Dr. Edward M. Beheler, from practicing medicine in St. Joseph, based upon a restrictive covenant, Article XXII of the partnership contract, which provided: "In the event Dr. Beheler leaves the partnership voluntarily or involuntarily, Dr. Beheler agrees that he will not practice medicine for a period of five (5) years from the date of his leaving the partnership within a radius of twenty (20) miles from the corporate limits of St. Joseph, Missouri * * *." Dr. Beheler filed a counterclaim for $40,000, allegedly due him for his percentage of the partnership assets and accounts receivable, under Article XVIII of the partnership contract.

Following trial by the court, without the aid of a jury, judgment was entered for defendant Beheler on plaintiff Willman's petition and against defendant Beheler on the latter's counterclaim, except that the court awarded Beheler $2,915.04, the amount Beheler was found to have paid for his interest in the partnership assets, and awarded Beheler the accounts receivable remaining uncollected as of the date of judgment. After filing unavailing motions for new trial both parties appealed. More than $30,000 is in dispute and, the notice of appeal having been filed prior to January 1, 1972, this Court has jurisdiction. Mo. Const. Art. V, §§ 3, 31, V.A.M.S.

Willman, an established surgeon practicing in St. Joseph, desiring to have a younger associate, contacted Beheler, who was completing his postgraduate medical training. On April 10, 1965 they entered into a one-year contract of employment. Willman advised Beheler prior to employment that a partnership would develop if the employment relationship proved satisfactory. A partnership agreement for the practice of medicine was entered into on December 1, 1966.

Article II provided that the partnership should continue "until dissolved by mutual

agreement or operation of law; either partner may terminate his interest in this partnership by the giving of a written notice to the other partner at least thirty (30) days in advance of the intended termination date."

Article XVIII, captioned "Leaving Partnership," provided:

"In the event a partner voluntarily leaves the partnership, he will be paid his percentage of the book value of all partnership assets, excluding the accounts receivable. The accounts receivable shall be frozen as of the date of the partner's leaving the partnership, and underlined with red pencil, and said leaving partner's share of said accounts receivable shall be based on his percentage of the net profits as set out in Article XV of this agreement, less any necessary collection expenses. Said leaving partner shall receive said percentage of said accounts receivable for a period of _____ months from the date said partner leaves the partnership. After the expiration of the _____ month period, all uncollected accounts receivable shall become the property of the remaining partner."

The agreement provided for division of profits at the following percentages for the first, second and third years, Willman to take the higher percentage in each instance: 65–35; 60–40; 55–45. After July 1, 1968 the partners were to share 50–50.

The partners were not compatible. There was tension in the office. Willman complained of lack of communication and consultation between the partners; failure of Beheler to cooperate in matters of patient care, trading weekends, office administration, etc. Willman was not satisfied with the way the partnership was working out and finally, on July 2, 1968, Willman handed Beheler the following letter: "After much thought and consideration and at the advice of Professional Management, I have decided to exercise the option of the contract with thirty days notice of termination of partnership." Beheler then wrote Willman, calling for compliance with Article XVIII. Beheler remained in St. Joseph and has continued to practice medicine there.

*On the Petition*

Appellant Willman contends that the court erred in refusing to enforce the restrictive covenant; that Beheler left the partnership involuntarily and was bound by his convenant prohibiting him from practicing in that event.

Beheler contends that Willman had no right to expel him; that the contract contemplates that if one partner leaves the other remains; that Willman was the "leaving" partner and Beheler the "remaining" partner; that since Beheler did not leave he did not leave involuntarily; that the parties did not intend to permit an "expulsion" of Beheler without good cause and that Willman did not have good cause to expel him; that Willman could not "terminate" the partnership without suing for dissolution under § 358.320 RSMo 1969, V.A.M.S.; that Article XXII is void as against public policy and constitutes an unreasonable restraint of trade.

■ Extensive extrinsic evidence was admitted at the trial relating to negotiations, communications and conversations between Willman, Beheler, Professional Management, Inc. and a lawyer touching the meaning of the words "leaves the partnership * * * involuntarily," as used in Article XXII. We deem these words to be plain, clear, unambiguous and unequivocal and not in need of construction arising out of extrinsic evidence bearing upon the intention of the parties. "If the terms of a contract are clear and unambiguous the contract will be enforced or given effect in accordance with its terms, and without resort to construction to determine the intention of the parties. State ex rel. National Life Insurance Co. v. Allen, 301 Mo. 631, 256 S.W. 737. In such case the construction of the parties, if at variance with the

written terms, will not be followed, Campbell v. Webb, 356 Mo. 466, 202 S.W.2d 35, but the contract will be construed as written. J. E. Blank, Inc. v. Lennox Land Co., 351 Mo. 932, 174 S.W.2d 862. 'When the language of a contract is plain, there can be no construction because there is nothing to construe.' Mickleberry's Food Products Co. v. Haeussermann, Mo.Sup., 247 S.W.2d 731, loc. cit. 738." Leggett v. Missouri State Life Ins. Co., 342 S.W.2d 833, 851 [11, 12] (Mo. banc 1960). In construing this unambiguous partnership agreement we seek to ascertain the intent of the parties by giving to the language used its natural, ordinary, and common sense meaning, looking to the entire contract, and considering the object, nature and purpose of the agreement. Wilshire Const. Co. v. Union Electric Co., 463 S.W.2d 903 (Mo.1971). We also observe the rule that this contractual writing is to be construed in the light of the law existing at the time it was entered into. State ex rel. Smith v. City of Springfield, 375 S.W. 2d 84, 91[3] (Mo. banc 1964). So considered, we conclude that the court erred in rendering judgment for Beheler and against Willman on the petition; that Article XXII is not void as against public policy; that Beheler left the partnership involuntarily; that Willman could "terminate" (actually, could dissolve by withdrawing from) the partnership and be entitled to enforcement of Article XXII without making a showing of good cause based on Beheler's misconduct, and that Willman could "terminate" the partnership without suing for dissolution under § 358.320 RSMo 1969, V.A.M.S.

■ In a partnership without a definite term either partner may dissolve the partnership by his act alone in accordance with his own will and pleasure. 60 Am. Jur.2d Partnership § 175. No fixed term for the duration of the partnership was agreed upon. Either partner could at any time "terminate his interest" in the partnership without the consent of the other, Bevins v. Harris, 380 S.W.2d 345, 352[7]

(Mo.1964); Schneider v. Newmark, 359 Mo. 955, 224 S.W.2d 968, 970[1] (1949), by giving the 30-day written notice. By Willman's act of giving the 30-day written notice provided for in Article II Willman thereby withdrew from the partnership— voluntarily "left" the partnership within the meaning of Article XVIII as of his own "termination" date, August 2, 1968, Cox v. Jones, 412 S.W.2d 143, 151 (Mo. 1966)—and *dissolved* the partnership. Willman's notice did not *terminate* the partnership, which would continue until the affairs of the partnership were wound up. ("In common parlance 'termination' is sometimes used to indicate a change in the status of a partnership when 'dissolution' would be legally correct." Landau v. Laughren, 357 S.W.2d 74, 82[6] (Mo. 1962); 68 C.J.S. Partnership § 330, fns. 44, 45.) Willman's letter of July 2, 1968 dissolved this partnership; there was no necessity to sue for dissolution under § 358.- 320 RSMo 1969, V.A.M.S. While there was no specific provision in the partnership agreement in terms authorizing either to expel or oust the other, there was inherent in the agreement the ever-present possibility that either partner might achieve that result by giving the 30-day notice (except, of course, in case of illness or disability of a partner, in which event under Article XVII the partnership could not be dissolved sooner than 6 months from the date of commencement of illness or disability).

■ In Beheler's brief an effort is made to reconstruct the partnership agreement in terms of "departing" partner and "remaining" partner; to rewrite Article XVIII to provide for payment by remaining partner to departing partner of his percentage of book value of partnership assets within 60 days after termination; to omit "voluntarily or involuntarily" from and add "before he is an equal partner" to Article XXII after the words "leaves the partnership," etc. on the ground that this is what the parties actually agreed to orally. As stated in Ackerman v. Globe-Democrat

Publishing Co., 368 S.W.2d 469, 479 (Mo. 1963), however, "[w]e cannot decide the case on the basis of what the parties may have intended to say. Our function is to determine what the parties intended by *what they did say*."

■ The references in the partnership agreement to "departing" and "remaining" partners were for descriptive or identification purposes only. They have no significant bearing on this case and did not create in Beheler the claimed legal status of "remaining" partner. Since a partnership consisting of two persons cannot continue to exist after one partner leaves the partnership there can be no such thing as a one-man partnership consisting of a "remaining" partner after the one partner leaves.

■ Willman's act of leaving the partnership dissolved the partnership ipso facto and as a matter of law. He left the partnership voluntarily, of his own free will. In contemplation of law both partners "left" the partnership when one of them left because upon dissolution the partnership ceased to exist as an entity. When the partnership ceased to exist as an entity Beheler "left" the partnership within the meaning of the law. His departure was involuntary as a matter of law. He left the partnership involuntarily as a result of the necessities of the situation. "Involuntarily" as used in Article XXII meant without will or power of choice—a change of status not resulting from volition or desire. Beheler's exit was not one "proceeding from choice." His leaving was "done * * * unwillingly or under compulsion." Cf. Webster's Dictionary definitions of "involuntary."

Beheler's leaving was involuntary not only as a matter of law but also as a matter of fact. Beheler regretted Willman's decision to terminate the partnership and so expressed himself. The plain inference from the record is that dissolution of the partnership was involuntary as far as Be-

heler was concerned, i.e. without his consent and against his will.

■ Under this contract it was not necessary for Willman to show that he had good cause, arising out of Beheler's real or fancied derelictions as a partner, to dissolve the partnership. The partnership agreement contained no such requirement as a precondition to "termination" or dissolution and none will be read into the contract by judicial construction. Either partner had an unconditional right to "terminate his interest in the partnership" and withdraw and dissolve the relationship (they are one and the same in this case) at any time, without the consent of his partner, for any reason deemed sufficient, Brannigan v. Schwabe, 133 S.W.2d 1053, 1055[2] (Mo.App.1939); 68 C.J.S. Partnership § 332a, with or without cause, upon giving 30 days' written notice. Count II of the petition, based on the alleged derelictions of Beheler, and the voluminous evidence pro and con on the issue of good cause were extraneous to the real issue, and the question of good cause is not a consideration on this appeal.

■ On the question of the reasonableness of the restrictive covenant Beheler argues that there is no time limitation on Willman's right to terminate the partnership; that if Willman could "expel" him by making him "leave involuntarily" Willman could have waited 30 or 50 years or any period of time and then at his slightest whim force Beheler out of his practice, thus "holding the power of life and death" over Beheler for the duration of the partnership. A similar argument in extremes was made in Freudenthal v. Espey, 45 Colo. 488, 102 P. 280, 286 (1909). An older physician employed a younger physician under a contract providing that on termination of the contract the latter would not practice in the city for five years. In an injunction suit to prohibit the latter from practicing in the city, following termination of employment, it was objected that under the terms of the contract de-

fendant might be held to an observance of the restrictive clause if he but served plaintiff for a day or an hour, and therefore the contract was unreasonable. Observing that such an extreme event fell outside the real scope of the contract; that this had not happened and clearly was not contemplated by the parties, the suggestion was rejected, the court saying that "The law is not so unreasonable as to set aside a man's own agreement for fear of an uncertain injury to him and fix a certain damage upon another." 102 P. l.c. 286. Willman and Beheler subscribed to Article XXII on December 1, 1966. Willman invoked the restrictive clause on July 2, 1968. Neither party interpreted the restrictive covenant to mean what Beheler now argues it might have meant. We will determine the reasonableness of the clause in the light of the situation presented and not on the basis of some extreme nonexistent hypothetical situation. So considered, the restrictive clause did not impose an unreasonable restraint upon Beheler.

■■■■ Beheler argues that there is a social need in Northwest Missouri and the vicinity of St. Joseph for the services of a skilled surgeon and that in determining whether to enforce this restrictive covenant the Court should weigh the benefit to the people of this section of the State which will result from a refusal to enforce the covenant, compared with the benefit to Willman by enforcing it; that "the community can ill afford the loss of Beheler for the personal satisfaction of Willman"; that as a matter of public policy Article XXII should not be enforced. There is a counterbalancing public policy which recognizes the interest of the public in protecting the freedom of persons to contract and in enforcing contractual rights and obligations. Lovelace Clinic v. Murphy, 76 N.M. 645, 417 P.2d 450 (1966); Beam v. Rutledge, 217 N.C. 670, 9 S.E.2d 476 (1940). The courts are concerned with "requiring those, who solemnly assume contractual obligations, to observe and fulfill them." Prentice v. Rowe, 324 S.W.2d 457, 466 (Mo.App.1959). "Contracts of this character, between physicians and surgeons, will ordinarily be enforced in equity on the grounds that, for breach of such a covenant, there is no adequate remedy at law, and that the object of the contract can be attained only by the parties conforming expressly and exactly to its terms." Thompson v. Allain, 377 S.W.2d 465, 467[3] (Mo.App.1964). And see cases 16 Mo.Dig. Injunction Key No. 61; 42 Am. Jur.2d Injunctions § 127. On its merits the public policy argument is weak for the reason that at this point in time most communities are short of professional medical practitioners, whose services ordinarily are as valuable and needed in one community of the State as in another. Foltz v. Struxness, 168 Kan. 714, 215 P.2d 133 (1950); Beam v. Rutledge, supra. In Freudenthal v. Espey, supra, a similar contract was held in no sense injurious to the public or forbidden by any principle of policy, the court pointing out that "* * * defendant can be as useful to the public at any other place as at Trinidad, and the interests of the community elsewhere are as important as they are there." 102 P. l.c. 285. And see Bauer v. Sawyer, 6 Ill.App.2d 178, 126 N.E.2d 844, l.c. 851[1] (1955). We find no reason to deny enforcement of Article XXII on the basis of public policy.

Having continued to practice in St. Joseph after the date he left the partnership Beheler violated the restrictive covenant. "The defendant is in the wrong. He is deliberately doing what he plainly agreed not to do." Freudenthal v. Espey, supra, 102 P. l.c. 286. The covenant being limited as to area and time, reasonably necessary to protect the fair and legitimate contract rights and interests of the parties, and otherwise reasonable and not contrary to public policy, and a breach having occurred, the restrictive covenant is one properly enforceable in equity. Bauer v. Sawyer, supra, 126 N.E.2d l.c. 851[2]. We therefore conclude that under Article XXII Beheler, having left the partnership involuntarily, was obligated for a 5-year period not to practice medicine within the restricted area.

This brings us to the question *how* Article XXII may be enforced. It restricts Beheler from practicing medicine for a period of 5 years "from the date of his leaving the partnership." Carried out literally this provision would prohibit Beheler from practicing in the restricted area from August 2, 1968 to August 2, 1973. Nearly five years having passed since August 2, 1968, the practical effect of literal enforcement of Article XXII would be to restrict Beheler from practicing medicine for only a few weeks. Willman suggests in the "Conclusion" of his brief on appeal that the 5-year period should commence at the time the judgment becomes final, but this cannot be decreed because the contract plainly provides that Beheler is not to practice medicine for the agreed period *from the date of his leaving the partnership,* and Willman's petition seeks injunctive relief under the provisions of the contract. Paraphrasing Brown v. Stough, 292 P.2d 176, 181 (Okl.1956), "[Willman] cannot now, by merely requesting the same in [his] brief in this court on appeal, obtain additional or greater relief than that prayed for in [his] petition or authorized by the contract sued upon."

We recognize that rights entitled to enforcement from a day certain for a defined period should not be lost or substantially diminished by the vagaries of protracted litigation. On the other hand, the realities of the situation may not be ignored. During the period August 2, 1968 to date Beheler has been transformed from a newcomer to the St. Joseph community, with but short acquaintance and limited practice, to an established and recognized medical practitioner and surgeon. To enforce the restrictive covenant from this day in May 1973 forward through May, 1978 would be inequitable and unfair, notwithstanding Beheler is in the wrong, because it would impose upon him a much harsher penalty than if his practice had been interrupted at the earlier date of August, 1968. This does not mean, however, that Willman's rights are not to be vindicated. Equity will not suffer a wrong to be without a remedy, and seeks to do justice and avoid injustice. Hydesburg Common School Dist. v. Rensselaer Common School Dist., 218 S.W.2d 833 (Mo.App. 1949). Once having acquired jurisdiction equity will retain it, under a prayer for general relief (there was such a prayer in this petition), to administer full and complete justice, within the scope of pleadings and evidence, between the parties. Anison v. Rice, 282 S.W.2d 497 (Mo.1955); Rockhill Tennis Club of Kansas City v. Volker, 331 Mo. 947, 56 S.W.2d 9, 20 (1932); Merz v. Tower Grove Bank & Trust Co., 344 Mo. 1150, 130 S.W.2d 611, 621 (1939). In framing its decrees equity has a broad discretion to adapt the relief to the circumstances of the particular case. Merrick v. Stephens, 337 S.W.2d 713 (Mo.App.1960); 27 Am.Jur.2d Equity § 247. While a court of equity is reluctant to, and ordinarily does not, grant a mere money judgment, it may do so in an appropriate case, Sebree v. Rosen, 374 S.W.2d 132, 138[8] (Mo.1964); Anison v. Rice, supra, 282 S.W.2d l.c. 502[4]; Louis v. Andrea, 338 S.W.2d 96, 105[13] (Mo.1960); 30 C. J.S. Equity §§ 71, 72; 30A C.J.S. Equity § 599, fn. 72, p. 667, where the necessities of the situation require this type of relief. The relief granted by equity is governed by the conditions and exigencies of the case shown to exist at the time of the entry of the decree, and not by circumstances existing at the time suit is filed. 27 Am. Jur.2d Equity § 249. The object and purpose of the protection afforded Willman by Article XXII was to insure him against financial loss arising out of competition with Beheler if the partnership failed. There is insufficient evidence in the record to determine the issue of financial loss, if any, sustained by Willman during the 5-year period. His net income from medical practice for the years 1965–1969 was shown but the evidence is obviously insufficient to form the basis of a determination of the issue. The only feasible way in which Article XXII may be enforced in favor of the covenantee and at the same

time protect the covenantor against an unjust penalty is to remand the cause for a hearing on the question of Willman's financial loss arising out of competition with Beheler, to give the parties an opportunity to present evidence on the issue whether during the period August 2, 1968–August 2, 1973 Willman sustained actual loss of net profits as a natural, direct and immediate result of the breach of covenant. In this connection see 54 Am.Jur.2d Monopolies, Restraints of Trade and Unfair Trade Practices § 579; Morrow v. Missouri Pac. Ry. Co., 140 Mo.App. 200, 123 S.W. 1034, 1039 (1909); Fuchs v. Curran Carbonizing and Engineering Co., 279 S.W.2d 211, 219 [16, 17] (Mo.App.1955); Anderson v. Abernathy, 339 S.W.2d 817, 824[5–7] (Mo. 1960); Red-E-Gas Company v. Meadows, 360 S.W.2d 236 (Mo.App.1962); Mills v. Murray, 472 S.W.2d 6 (Mo.App.1971).

o

## On the Counterclaim

Appellant Beheler assigns error in refusing to enforce Article XVIII as written. He claims that he is entitled to judgment for all of the partnership assets in exchange for their book value (approximately $200) and all of the accounts receivable in the amount of $23,634.21.

As to partnership assets: Article XIII provided for the purchase by Beheler of a one-half interest in the capital assets (medical instruments, pharmaceutical supplies, office equipment and furniture) for the price of $3,242.03, to be paid by Beheler executing to Willman a nonnegotiable, noninterest-bearing promissory note payable in 36 equal monthly installments. The actual value of these assets on August 2, 1968 was $20,000–25,000, but their depreciated book value was only $208.10. The promissory note was never given, but Beheler made payments and received credits totaling $2,915.04, thereby reducing the $3,242.03 debt to $326.99.

Instead of enforcing the first sentence of Article XVIII (under which Willman would have been paid about $200 for his interest in capital assets worth $20,000–25,000) the trial court decreed that "in equity and good conscience" Willman should have the privilege of acquiring Beheler's interest therein by refunding to Beheler the $2,915.04 paid by Beheler thereon.

As to the accounts receivable: Article XII provided that all accounts receivable created prior to as well as after July 1, 1966 should be owned by the partnership and distributed according to the percentage of profits agreed upon. There were blank spaces in Article XVIII which were never filled in, because Willman could never get Beheler to discuss the matter. Willman tried to reach an agreement with Beheler on these things but failed. The parties never did agree upon a period of time to be inserted. The accounts receivable amounted to $59,819.22 on July 31, 1968. Willman continued to collect the accounts receivable and by agreement the collections were divided between the ex-partners on the basis of 55% to Willman and 45% to Beheler.

The trial court decided that three years was a reasonable period for collection and division of the accounts receivable; the judge in effect "filled in the blanks" and decreed that all amounts collected prior to August 1, 1971 be divided 55% to Willman and 45% to Beheler, and that all accounts unpaid by August 1, 1971 become the property of Beheler.

■■■■ Where blanks are left in a written instrument and not filled in the agreement is uncertain and incomplete, and there is no meeting of the minds. Bengimina v. Allen, 375 S.W.2d 199, 203 (Mo. App.1964). We find that because of Beheler's failure to execute the promissory note called for or pay the full amount agreed upon, and the failure of the parties to fill in the blanks in Article XVIII, there was no meeting of the minds with reference to capital assets and accounts receivable. This is confirmed by the testimony of both parties that the agreement actually made orally differs from that finally drafted in Article XVIII. Considering the equities of the situation and the practical construction the parties have given these subjects the decree of the trial court on the

counterclaim is not clearly erroneous and is affirmed.

Decree nisi affirmed as to the counterclaim and ordered held in abeyance until the issues on the petition are determined; decree reversed as to the petition and cause remanded for further proceedings consistent with this opinion, with instructions to enter final judgment on both petition and counterclaim when the issues on the petition are finally adjudicated.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.