**HIGHLAND INNS CORPORATION,**
Respondent,

v.

**AMERICAN LANDMARK CORPORATION, and Overton Realty,**
Inc., Appellants.

No. WD 33117.

Missouri Court of Appeals,
Western District.

April 12, 1983.

Gary G. Sprick, Fayette, for Landmark Corp.

Daniel Ochstein, Holts Summit, for Overton Realty.

Walter H. Bley, Jr., Sapp, Woods, Orr & Bley, Columbia, for respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The appeal involves obligations under a contract to purchase real estate. The subject of the transaction was a Master Host Inn and grounds in the city of Columbia. Highland Inns was the seller, American Landmark was the buyer, and Overton Realty, Inc. was broker and agent for the seller. The contract provided, among other terms:

Buyer to pay seller $950,000 on closing. Subject to buyer obtaining a one year first mortgage in the amount of $1,300,-000.00. If buyer has not obtained and delivered to seller a long term mortgage commitment in the amount of $1,300,-000.00 on or before August 19, 1978, this contract is null and void.

A separate term of the contract required the buyer to deposit $10,000 as earnest money, with the proviso:

"Said deposit to be applied on the purchase price upon closing. If the Buyer fails to fulfill his obligations hereunder, the aforementioned deposit shall become the property of the Seller and his agent, not as a penalty, but as liquidated damages."

The buyer made the deposit, but was unable to obtain the long-term mortgage commitment within the date specified in the contract, or for some time thereafter. The seller sued for the $10,000 deposit and joined the escrow agent as well as the buyer as defendants. The defendant American Landmark counterclaimed that the Highland Inns was without right or interest in the $10,000 deposit and cross-claimed that agent Overton Realty, escrow stakeholder, was obligated to pay the deposit over to American Landmark, and sought adjudication of ownership to the money.

■ The court found the evidence was that agent Overton dissipated the escrow funds, and denied the counterclaim for commission. The court entered judgment for seller Highland Inns against the buyer American Landmark and the agent Overton. The defendant Overton does not appeal, either from the denial of the counterclaim for commission or from the judgment for $10,000 in favor of the plaintiff Highland Inns. The defendant American Landmark, buyer under the contract, appeals from the judgment in favor of the seller plaintiff Highland Inns.[1]

The contract for the motel purchase was executed by the principals on August 12, 1978. The purchase price of $950,000 was not due until closing. The sale transaction was subject to delivery by the buyer to the seller of a long-term mortgage commitment in the amount of $1,300,000 on or before August 19, 1978, otherwise the agreement became "null and void." The evidence was that upon the execution of the contract, the seller Highland Inns removed the property from the market. Two days after the contract was signed, on August 14, 1978, Waugh, Highland Inns president [and signatory] refused an offer from another buy-

1. The judgment does not expressly determine the American Landmark counterclaim against Highland Inns nor the American Landmark crossclaim against the defendant Overton. The subject matter of each of those claims, however, are contentions that the claimant, to the exclusion of the other and of the plaintiff Highland Inns, was entitled to the $10,000 deposit under the terms of the contract. That is to say, all of the several claims rest on a perceived operation of the contract which entitles the one to the escrow deposit to the exclusion of the others. Thus, the judgment by the court in favor of plaintiff Highland Inns and against American Landmark and Overton necessarily determines the American Landmark and Overton claims adversely to contention. Thus, we have before us a final judgment for review within the definition of Rule 74.01 even though the formal entry mentions neither the counterclaim or the crossclaim. *Glick v. Glick,* 372 S.W.2d 912, 915[2–7] (Mo.1963); *Commercial National Bank of Kansas City, Kansas v. White,* 254 S.W.2d 605, 609[5] (Mo.1953).

er, for an amount $200,000 in excess of the price American Landmark agreed to pay. There was another offer in the interim, and also refused for the reason that Highland Inns was already bound to American Landmark.

The first communication between the parties after the contract was executed on August 12th, was on August 18th, just one day before the long-term commitment was due for delivery to the seller Highland Inns under the contract. Smith, president of American Landmark, placed a telephone call for Waugh, Highland Inns president, but received by the secretary in his absence, to inform him that Smith had obtained a long-term commitment. Waugh returned the call that same day and was informed by Smith to the same effect. Smith added that the loan for the commitment was consummated with an eastern bank and would be "ready for closing the following week." Smith asked that the time to close the transaction be extended a "week or so." [The version by Smith was that he told both the secretary and Waugh only that "I thought I had a deal to get the mortgage commitment." Two Overton Realty agents also testified that Smith informed them he had obtained the commitment.] Smith also requested copies of the plans and specifications of the Master Host building and property as well as other details. Waugh agreed to the extension. No issue is made as to the specifications and other documents, so we assume that aspect of the transaction went uneventfully. From that August 18th agreement to extend performance for the long-term mortgage commitment until about the middle of September, Smith and the Overton agents continued to assure Waugh, some thirty or forty times over, that the mortgage commitment was in hand. It never came.

Highland Inns ultimately contracted on September 21, 1978, to sell the motel to Hakimi Enterprises for $900,000 and closed the transaction on October 2, 1978. Highland Inns then sued for the $10,000 as liquidated damages under the contract with American Landmark.

The court ordered escrow agent Overton to pay over the sum of $10,000 to the plaintiff Highland Inns, denied the claim of Overton for commission, and rested judgment against the defendant American Landmark on the express grounds: "that said sum is liquidated damages and that Defendant American Landmark is estopped on basis of representation made as to having secured financing." The defendant American Landmark construes the judgment as based on equitable estoppel and impugns the efficacy of that doctrine to give a litigant affirmative remedy. He cites authority that equitable estoppel may preclude a claim, but does not engender a right—it is a matter of defense, not remedy.[2] The plaintiff Highland Inns joins the argument to sustain the validity of equitable estoppel as a cause of action, and thus to justify the judgment.

■ We do not undertake to construe whether the judgment rests on estoppel, or to decide between the contentions that the doctrine, in law, does or does not allow the remedy the court gives. The parties all

---

**2.** The most frequently cited definition of the term is given in 3 J. Pomeroy, A Treatise on Equity Jurisprudence § 804 (5th ed. 1941):

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

Our cases describe equitable estoppel as "an affirmative defense" [*Emery v. Brown Shoe Company*, 287 S.W.2d 761, 767[4] (Mo.1956) ], as a doctrine which "does not itself give a cause of action; its purpose being to preserve rights already acquired and not to create new ones." *State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co.*, 331 Mo. 337, 53 S.W.2d 394, 401[14] (banc 1932), etc.

That equitable estoppel is not a rigid principle of defense, but—at least as applied to contract law—is an incident of the assertion and preclusion of contract obligations is at least intimated in Corbin on Contracts § 196A (Supp.1982).

claim and defend under a written contract, and the contentions are adjudicable under the usual principles of contract law: offer, acceptance, consideration, and performance, *Staples v. O'Reilly,* 288 S.W.2d 670, 673[1–3] (Mo.App.1956). The petition pleads a breach of contract, the American Landmark counterclaim against the plaintiff Highland Inns and crossclaim against agent Overton seeks restoration of the $10,000 sum from breach of the contract by plaintiff, and the evidence sustains the judgment for the plaintiff for breach of contract. Thus we conclude the trial court judgment came to the correct result, whatever the validity of the equitable estoppel ground [if so it be] expressed as the theory of adjudication. *Lancaster v. Simmons,* 621 S.W.2d 935, 942[9] (Mo.App.1981).

It is the entire sense of the American Landmark contention that the real estate contract "[did] not [become] operative until the mortgage commitment ha[d] been obtained," that absent that condition met, "the obligations and rights of the parties d[id] not become absolute." In a word, the defendant buyer contends that the delivery of a mortgage commitment in the sum of $1,300,000 to the seller by August 19th was the condition upon which any obligation between them arose. This argument confuses contract obligation with contract performance.

A contract transaction consists of a series of operative facts [3A Corbin on Contracts § 741, p. 446 (1960)]:

First, there is an offer, stating the terms, the conditions, and the promises that are to be agreed upon. Next comes acceptance by the offeree. It is useful to say that the offer created a power in the offeree. The acceptance is the exercise of this power. *After acceptance, the new situation of the parties is that neither can withdraw. It is useful to say that they are under obligation, that rights and duties have been created; but* usually still other facts and events must occur before actual performance is due. *These facts and events,* although occurring subsequently to the acceptance of the offer

and to the primary obligation created thereby, *are conditions precedent to the duty of immediate performance and to any right of action for breach.* [emphasis supplied]

The flaw in the thesis the buyer American Landmark proposes then is to assume that the signatures on the contract by the buyer and seller—offer and acceptance—created no obligation upon either of them until the mortgage funds were delivered on or before August 19th. The contract was one of bilateral terms, mutual promises for mutual performances. *Middleton v. Holecroft,* 270 S.W.2d 90, 92[1–3] (Mo.App.1954). The seller agreed to convey the motel premises to the buyer by warranty deed upon payment of $950,000 upon condition that the buyer obtain the $1,300,000 mortgage by August 19th—seven days hence. The buyer made the concurrent promise to—and did—deposit $10,000 in escrow "as a guarantee that the terms and conditions of this contract shall be fulfilled by the buyer." The seller promised to convey to the buyer, to the exclusion of anyone else, in exchange for the promises of the buyer to purchase the motel property for $950,000 on condition of delivery to the seller of a mortgage commitment by August 19th and the deposit of $10,000 to ensure that performance. Thus, the seller promised two performances: to remove the motel property from the market, and to convey upon a mortgage commitment and payment of a $940,000 purchase price balance. These were both deferred performances. The purchaser promised three performances: to pay a deposit of $10,000, to obtain a mortgage commitment, and to pay the $940,000 purchase price balance. One was intended as immediate performance—the $10,000 deposit— the other two were deferred. A performance or a return promise suffices as consideration for a return promise or performance. Restatement (Second) of Contracts § 71 (1979); *Mohawk Real Estate Sales, Inc. v. Crecelius,* 424 S.W.2d 86, 90[4–6] (Mo.App.1968). Thus, after acceptance, the parties were under obligation to each other to make the performances promised, and neither could withdraw with impunity. 3A Corbin on Contracts § 741, p. 446 (1960).

That the primary performances were not immediate, but deferred—the payment of the purchase price by the buyer and the conveyance of the property by the seller—does not affect the validity of the undertaking as a consummated contract. The seller Highland Inns, upon agreement to the terms, suffered an immediate detriment—that it withhold the motel property from the market during the time the buyer was to make its primary, albeit deferred, performance: mortgage delivery and payment of the purchase price balance. The buyer American Landmark also suffered an immediate detriment—the deposit of $10,000. *Wells v. Hartford Accident & Indemnity Company,* 459 S.W.2d 253, 260[10–12] (Mo. banc 1970). Thus, that another event—the delivery of the mortgage—was to occur before the primary obligation of the seller to convey was due does not affect the validity of the undertaking as a contract upon execution—as the buyer contends—but was merely a condition precedent to the duty of the seller to convey and to any right of action by either party for breach.

■ A condition *presupposes* an existent contract and not the converse, as the defendant argues.[3] In terms of contract law, a *condition* is defined as [Restatement (Second) of Contracts § 224 (1979)]: "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." *See also* 3A Corbin on Contracts § 739 (1960). Thus, a *condition* denotes an event which qualifies a duty under an already subsistent contract. "Events which are part of the process of formation of a contract, such as offer and acceptance, are therefore excluded under the definition in this section." Restatement (Second) of Contracts § 224, illustration *c,* Necessity of a contract (1979). That is to say, if the event the condition calls for [the delivery to

the seller of the mortgage commitment] does not occur, performance *thereafter* is excused. In the contract terminology employed by the parties, the duty of the buyer and seller to perform thereafter—to pay the purchase price and to convey good title—is "null and void," extinguished, terminated. That accords with our settled law that "no promise based upon a condition can be enforced as such until the contingency upon which it depends has happened." *McIntyre v. Kansas City,* 237 Mo.App. 1178, 171 S.W.2d 805, 811[1, 2] (Mo.App.1943).

■ The question remains: what other relations between the buyer and seller did the failure to meet the delivery of mortgage condition affect? The buyer contends it was entitled to the return of the $10,000 deposit because the *entire* contract obligation was contingent upon the event of a mortgage commitment. We rule, however, that only the performances called for *thereafter* were excused. The $10,000 was an earnest money deposit to

> "guarantee that the terms and *conditions* of this contract shall be fulfilled by the Buyer. Said deposit to be applied on the purchase price upon closing. If the Buyer fails to fulfill his obligations hereunder, the aforementioned deposit shall become the property of the Seller . . . ." [emphasis added]

The terminology promises that the $10,000 deposit guarantees that the Buyer will perform both the terms and *conditions of agreement*—in the context of contract, that the buyer will deliver to the seller a mortgage commitment by August 19th. That was a condition never fulfilled on that date, or at any later date to which that performance was extended by the seller. It was a performance required of the buyer at the time of the execution of the contract, for

---

**3.** The defendant buyer cites the contract term: "If buyer has not obtained and delivered to seller a long term mortgage commitment in the amount of $1,300,000.00 on or before August 19, 1978, this contract is null and void" to conclude that "[this] language and condition of the contract makes it clear that the contract is not operative until the mortgage commitment

has been obtained." Our conclusion, as we state and continue to demonstrate, is that the condition does not affect the validity of the contract as an allocation of rights and obligations, but is merely an event which must occur until other performances—in this case, the primary performances by either party to pay and to convey—are due.

the very purpose to protect the seller against the nonoccurrence of the condition, and so was not a performance excused by the nonoccurrence of the mortgage commitment event. The reason is evident: the agreement to sell amounted to a removal of the million dollar motel property from the market and bound Highland Inns not to negotiate with any other prospect. In fact, Highland Inns, only days later was obliged to decline an offer to purchase the premises for a price $200,000 more than the American Landmark contract specified. The amount Highland Inns ultimately realized from the sale to Hakimi Enterprises was $50,000 less than the contract price agreed to by American Landmark.

▬ The buyer American Landmark argues, nevertheless, that "this type of real estate contract is commonly used in the purchase and sale of real estate in Missouri" and so means to imply, we assume, a uniform understanding among those who use the form that the nonoccurrence of a mortgage commitment reverts the deposit to the buyer upon failure of that condition. We note at outset that the form is a Kansas and not a Missouri form, but adapted for the Missouri transaction. We assume for the purpose of contention that the form not only is a Missouri instrument but also that it is of the kind uniformly used by real estate agents and others for the usual real estate transaction in this state. We come to our determination that the seller is entitled to the deposit not by the terms of the form, but by the form as completed into an integrated contract. The form, devoid of insertions of the essential terms—subject matter, legal consideration, time of performance, and other conditions—binds no one. *Bengimina v. Allen*, 375 S.W.2d 199, 202[1–6] (Mo.App.1964). We come to decision, rather, by the form as completed by the insertions into a valid and enforceable bilateral contract. These completions, the terminology used, the additional terms were all the handiwork of the *buyer, himself* —Smith, President of American Landmark and contract signatory.

The mortgage commitment term: "If buyer has not obtained and delivered to seller long term mortgage commitment in the amount of $1,300,000 on or before August 19, 1978, this contract is null and void" —is a condition the buyer himself fashioned and inserted to qualify the obligation of the "buyer to pay seller $950,000 on closing." The printed form [paragraph 4], however, specifies that the earnest money deposit, required by the terms and made by the buyer at outset, was a "guarantee that the *terms and conditions* of this contract shall be fulfilled by the Buyer [and that] [i]f the Buyer fails to fulfill his obligations hereunder, the aforementioned deposit shall become the property of the Seller . . . ." [emphasis added]

We have already determined that the nonoccurrence of the mortgage commitment condition excused performance by both parties thereafter. That is the sense of the *null and void* terminology chosen by the buyer who composed that condition and inserted it as a provision of contract. Restatement (Second) of Contracts § 225(2) (1979). The question which remains is whether: although the contract excuses performances *after* the nonoccurrence of condition, the contract nevertheless places the buyer under a duty to make the condition occur. The principle is given in Restatement (Second) of Contracts § 225(3) (1979):

> Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.

> Comment d . . . The same term may, however, be interpreted not only to make an event a condition of the obligor's duty, but also to impose a duty on the obligee that it occur. And even where no term of the agreement imposes a duty that a condition occur, the court may supply such a term.

The printed form calls for the deposit money to be paid to the seller as damages should the buyer fail to fulfill a term or condition. The buyer himself inserted a term that the delivery of a mortgage commitment be a condition of the obligation of

the buyer to pay the purchase price and of the seller to convey. The buyer was an experienced real estate entrepreneur. It was within his power as drafter of the mortgage commitment condition to dispel any doubt that he assumed the duty to bring about the occurrence of condition by language to the effect that not only future performance was excused by the nonoccurrence of the event "[this contract is null and void"], but also that he assumed no duty that the condition occur by additional words to the effect—"this contract is null and void and the earnest money deposit shall return to the buyer."

In the circumstances of this transaction, we construe the contract to mean that the buyer assumed the obligation to bring about the occurrence of the condition—the mortgage commitment—and that, although in the event of nonoccurrence of that condition future performance was excused, the failure to deliver the mortgage commitment was a breach of a separate duty for which the $10,000 deposit was the agreed damage. This follows from the subject matter of the transaction [a million dollar commercial property], from the position of the parties [the buyer a reputed millionaire with ready access to financial markets and so, presumably, able to deliver the mortgage commitment within the time he himself specified], the obvious detriment to the seller from a valuable property removed from the market, and from the role of the buyer as the drafter of the agreement. *John Deere Company v. Hensley*, 527 S.W.2d 363, 365[2] (Mo. banc 1975); Restatement (Second) of Contracts § 206 (1979). We conclude that the purpose for the $10,000 deposit term in the context of the contract provisions was to define the measure of damages to the seller for the breach of the duty by the buyer to deliver a timely mortgage commitment. Restatement (Second) of Contracts § 202 (1979).

The parties to a contract, of course, may effectively provide in advance the damages that are to be payable as long as the term does not disregard the principle of compensation: Restatement (Second) of Contracts § 356 (1979):

Liquidated Damages and Penalties

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

The public purpose subserved by the enforcement of such a provision is to save "the time of courts, juries, parties and witnesses and reduce the expense of litigation." Comment *a* to § 356, supra. The essential objective of a contract remedy is to compensate, not punish, therefore a penalty for a breach, albeit guised as compensation, is not enforceable. The test to determine whether the money fixed as damages is so unreasonably large as to be a penalty is twofold [comment *b*. Test of penalty § 356, supra]: (1) whether the amount fixed "approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches" and (2) "the difficulty of the proof of loss." *Corrigan Company Mechanical Contractors, Inc. v. Fleischer*, 423 S.W.2d 209, 213, et seq. (Mo.App.1967); *Stein v. Bruce*, 366 S.W.2d 732, 736[9–10] (Mo.App.1963). There was evidence of loss—from $50,000 to $200,000. The money fixed at $10,000 as damages by the contract was not, therefore, an unreasonable anticipation of loss by reason of nonperformance. Our decisions hold also that at execution, actual damages for breach of a real estate contract are both uncertain in amount and difficult to prove. *Carmel v. Dieckmann*, 617 S.W.2d 459, 461[4–5] (Mo.App.1981).

The petition, the counterclaim and crossclaim all contend the right to a *deposit* given in escrow by the buyer to the agent to ensure performance. The circuit court determined that neither the buyer, nor the agent, but only the seller is entitled to the $10,000 deposit. The circuit court found

that the agent had dissipated the $10,000 deposit and so disallowed any claim by the agent against the fund for a commission. The *deposit* made by the buyer to the agent is all that the plaintiff claims by this petition, and is all that the plaintiff is entitled to under the contract. The judgment of the circuit court expressly orders the defendant Overton [agent] "to pay the sum of $10,000 to Plaintiff." The judgment entitles the seller to no redress against the buyer other than to exclude the buyer from any right to the fund.

The judgment is affirmed.

All concur.