42 S.W.3d 794 (2001)
MECO SYSTEMS, INC., Plaintiff-Appellant,
and
Artisan Construction Services, Inc., Intervenor Plaintiff-Cross-Claimant-Respondent,
v.
DANCING BEAR ENTERTAINMENT, INC., Defendant,
Empire Bank, Defendant-Respondent,
and
William A.R. Dalton, Trustee for Empire Bank, Defendant-Respondent,
and
Delvan Mitchell Ceiling Company, John O'Neal d/b/a John O'Neal Sheet Metal, Table Rock Asphalt, and William J. Zickel, Intervenors-Respondents,
and
Ronald C. Middleton, et al., Defendants.
No. 23093.
Missouri Court of Appeals, Southern District, Division One.
February 14, 2001.
Motion for Rehearing and Transfer Denied March 22, 2001.
Application to Transfer Denied April 24, 2001.
*798 Lincoln J. Knauer and Lee J. Viorel, Springfield, for Appellant.
Joseph A. Bohrer, Springfield, for Respondent Artisan Construction Services, Inc.
Lynn C. Rodgers, Springfield, for Respondents Empire Bank and Trustee.
Douglas S. Evans and Robert G. Asperger, II, Springfield, for Respondents Delvan Mitchell and William J. Zickel Company.
Christopher J. Stark, Springfield, for Respondent John O'Neal.
Richard L. Schnake, Springfield, and David L. Smith, Branson, for Table Rock Asphalt, Inc.
SHRUM, Judge.
This appeal arises from a mechanic's lien case and suit for damages by MECO Systems, Inc. ("MECO") against Dancing Bear Entertainment, Inc. ("DBE"), owner of the Charley Pride Theater at Branson, Missouri. In a counterclaim, DBE sought liquidated damages per a contract clause because of MECO's alleged failure to timely complete construction. Other parties to this case who have filed briefs with this *799 court are Empire Bank (holder of first deed of trust), its trustee, and some of MECO's subcontractors who joined the litigation as intervenors. The trial court (a) denied MECO's request for a mechanic's lien, (b) entered judgment for MECO against DBE for unpaid construction costs, (c) rendered money judgments for subcontractors against MECO, (d) awarded liquidated damages to DBE and against MECO, (e) gave some subcontractors first lien status, and (f) denied MECO's claim for unjust enrichment. MECO appeals advancing multiple claims of trial court error. We affirm.

REVIEW STANDARDS
Review of mechanic's lien and contract suits is under Rule 84.13(d). White River Dev. v. Meco Systems, 806 S.W.2d 735, 736 (Mo.App.1991).[1] As that rule is construed, we are to affirm the judgment unless there is no substantial evidence to support it, the judgment is against the weight of the evidence, erroneously declares the law, or erroneously applies the law. Id. at 736-737. "A judgment is to be set aside because it is against the weight of the evidence only with caution and with a firm belief that the ... judgment is wrong." Id. at 737.
The phrase "weight of the evidence" refers to "its weight in probative value, not its quantity." Id. The weight of evidence is determined by its effect in inducing belief, not by mathematics. Id.
Appellate courts give due regard to the trial court's determination on the credibility of witnesses. Id. "The trial judge as the trier of fact can disbelieve testimony even where uncontradicted." Id.

FACTUAL SYNOPSISMECO'S MECHANIC'S LIEN CLAIM
On August 25, 1993, MECO and DBE entered into a contract under which MECO, a corporation, would build a theater at Branson, Missouri, for DBE, a corporation. The August 25, 1993, document (herein the "Main Contract") had two parts, namely, a "Standard Form of Agreement Between Owner and Contractor" produced by the American Institute for Architects ("AIA") and an "Amendment" prepared by DBE's lawyer. MECO's work under the Main Contract was described as "site preparation, parking lot paving, parking lot lighting, and construction of the Theater Building, complete." In return, DBE agreed to pay MECO for "Cost of the Work," defined as the cost of labor, materials, equipment, payments made under MECO's subcontracts, and incidental costs as described therein. Also, DBE agreed to pay MECO a contractor's fee of six and one-half percent of the total job cost.
When the AIA contract form was signed, the parties were awaiting a building permit from the city of Branson. Also, DBE's financing needs had not been met. The parties addressed these issues in the Amendment, as follows:
"2.... In the event [the] building permit is obtained prior to the close of [DBE's] construction financing, the date of commencement shall be no later than five (5) days following the date of closing of [DBE's] construction financing.
....
"7. The parties ... agree that the Agreement shall be contingent and conditioned *800 upon the closing and funding of all financing to be provided to [DBE] for acquisition of the site and construction of the improvements described herein."
On August 26, 1993, MECO obtained a grading permit. However, neither the financing nor building permit had been obtained by August 31, 1993. Accordingly, on August 31, 1993, DBE's lawyer sent a letter to MECO that provided, inter alia:
"[DBE's] financing contingency is not yet satisfied.... Although we do not expect any problems ... [DBE] is not yet in a position to waive the contingency for the closing of financing under the Addendum. However, [DBE] ... does not want to hold up MECO ... from its time schedules. Therefore, [DBE] has instructed me to advise [MECO] to proceed with grading and work under the contract for the next ten (10) days subject to a Stop Work Order in the event any problems arise in satisfying the financing contingencies. Proceeding in this manner, [DBE] will be responsible only for the work actually performed during this period of time until a Stop Work Order is issued."
DBE's letter advised MECO if it found the proposal agreeable, it should sign and return a copy of the letter to DBE. MECO did agree, signed the letter, and returned it as directed. MECO then commenced and worked on site preparation for ten days.
On September 10, 1993, DBE's lawyer wrote to MECO and authorized an additional ten days' work "pursuant to the terms of my letter of August 31, 1993, and the above-referenced contract and the Addendum thereto." As before, DBE cautioned that its "authorization [for ten days' site work] is without waiver of any provision in the contract or its addendum."
When the second ten-day period passed without DBE's financing in place, MECO wrote DBE on September 20, 1993, as follows:
"We understand you anticipate closing... the financing ... September 21, which will enable you to waive the [financing] contingency ... and release us to proceed with all buy-out of the project. We look forward to that release.
"In the meantime, please sign and return a copy of this letter authorization for MECO ... to order ... steel ... and Building parts....
"Signing of this letter will also authorize continuance of the site preparation past today's date...."
DBE signed and returned the letter to MECO with this notation: "Authorization to continue work extended to September 30, 1993 pursuant to terms of prior correspondence authorizing commencement of work."
On September 29, 1993, DBE's lawyer wrote MECO advising DBE was releasing "the financing contingency set forth in the Addendum." On October 4, 1993, MECO sent DBE a labor and material invoice that covered the period July 9 through September 25, 1993. The invoice amount was $52,938.41. It did not, however, contain the mechanic's lien notice mandated by § 429.012. In late October 1993, DBE paid the invoice amount ($52,938.41) without having previously received a § 429.012 notice from MECO.[2]
MECO next billed DBE on November 4, 1993, with a document entitled "Invoice 2." This invoice contained the notice mandated by § 429.012, as did all subsequent monthly *801 invoices submitted by MECO to DBE. DBE timely paid MECO on the invoices until June 1994. MECO in turn promptly paid its subcontractors during those periods.
On June 2, 1994, MECO billed DBE for $872,344.91 for work from May 1, 1994, through May 28, 1994. DBE only paid part of this billing and never fully paid later invoices submitted by MECO.
Once DBE quit paying MECO, it (MECO) stopped paying its subcontractors. MECO's refusal to pay its "subs" was based on a "pay if paid" provision in the contracts between MECO and its subcontractors.
The cessation of payments led to a morass of litigation and ultimately to the judgment summarized in the opening paragraph of this opinion. Additional facts are given when needed to analyze points relied on.
MECO'S FAILURE TO COMPLY WITH BRIEFING REQUIREMENTS OF RULE 84.04
At the outset, we are confronted with motions and argument by several respondents to strike or dismiss four of MECO's five points on appeal for failure to comply with the briefing requirements of Rule 84.04. Those motions, taken with the case, are denied.
We caution, however, this ruling does not mean we find that the points in MECO's brief comply with Rule 84.04. They do not comply. This excerpt from another mechanic's lien case, Norman v. Ballentine, 627 S.W.2d 83 (Mo.App.1981), explains our decision to address MECO's claims of trial court error:
"Inadequate briefs of counsel are a disservice to parties so represented and a burden on the system of justice. See Thummel v. King, 570 S.W.2d 679, 686 (Mo.banc 1978). Because of the result here reached, however, suspension of strict application of Rule 84.04 will work no hardship on the respondent. Our jurisdiction is apparent from the record, and we have been able to determine the facts of the case and the issues to be decided from the briefs and transcript. A punitive order of dismissal would serve no purpose here, but we trust that members of the bar will take heed of the warning implicit in our discussion of this matter."
Id. at 85.

DISCUSSION AND DECISION
POINT I: DENIAL OF MECO'S REQUEST FOR MECHANIC'S LIEN
The trial court denied MECO'S claim for a mechanic's lien because it found MECO did not comply with § 429.012. Specifically the court found MECO failed "to provide the required notice with the first invoice."
In pertinent part, § 429.012.1 provides:
"1. Every original contractor, who shall do ... work ... or furnish any material ... for any building ... under or by virtue of any contract ... shall provide to the person with whom the contract is made ... prior to receiving payment in any form ... from such person, (a) either at the time of the execution of the contract, (b) when the materials are delivered, (c) when the work is commenced, or (d) delivered with first invoice, a written notice which shall include the following disclosure language in ten point-bold type...." (Emphasis supplied).
Subsection 2 then states:
"2. Compliance with subsection 1 of this section shall be a condition precedent to the creation, existence or validity of any mechanic's lien in favor of [an] original contractor."
*802 In Gauzy Excav. and Grading v. Kersten Homes, 934 S.W.2d 303 (Mo.banc 1996), the supreme court emphasized the mandatory nature of the § 429.012 notice and the reasons therefor:
"By its unambiguous terms, these sections require all original contractors to provide a specific notice to the person with whom the contract for work is made before suit can be brought. The notice is designed `to warn inexperienced property owners of the danger to them which lurks in the mechanics' lien statute.' Our courts have demanded strict compliance with the notice provision and have been reluctant to allow exceptions other than those provided by the statute itself.
....
"[The requirement of strict compliance with § 429.012.1] is based in part on a concern that recognition of exceptions to the statute that excuse knowledgeable developers and others who are sophisticated in the areas of real estate and construction will likely result in a plethora of case-by-case determinations. The bright-line rule mandated by the statute gives the best guidance to owners and contractors alike."
Id. at 304-06 (citations omitted).
In its first point, MECO neither questions nor challenges the "bright-line" rule stated in Gauzy. It argues, however, that the "financing contingency" in the Addendum was a "condition precedent" and as such, "there was either no agreement at all, or no enforceable agreement until that condition was satisfied by the September 29th letter." Based on that premise, MECO contends the work and materials it furnished from July 9 through September 25, 1993, were not provided "under or by virtue" of the Main Contract, but under separately enforceable agreements independent of the Main Contract, namely, the three "ten-day letter contracts." As to the "ten-day" contracts, MECO claims they were formed when the letters were exchanged, and that each created its "own sets of rights and liabilities."
In advancing this argument, MECO concedes the obvious, which is the ten-day letters expressly referred to the Main Contract and requested MECO to proceed with "work under the contract." MECO insists, however, the ten-day letter agreements only mentioned the Main Contract to define the scope of the work to be performed thereunder.
With the argument thus forged, MECO would have us find that its November 4, 1993, invoice to DBE (which contained the § 429.012.1 notice) was the first billing for labor and materials furnished "under or by virtue" of the Main Contract; consequently, it complied with the strict notice requirements imposed by § 429.012.1. MECO thus claims we should find reversible error in the court's denial of MECO's mechanic's lien claim.
We agree that MECO and DBE intended the financing provision to be a condition precedent to the respective parties' duty to perform. We reach that conclusion based on the language used in the Addendum, the circumstances surrounding its execution, and the purpose sought to be accomplished thereby. See Richard's Original Long Creek Lodge v. Seymour Inn, Inc., 791 S.W.2d 944, 945 (Mo.App. 1990).
On the other hand, MECO's basic premise that the presence of the condition precedent in the Addendum meant "there was either no agreement at all, or no enforceable agreement until [the financing contingency] was satisfied" is flawed. First, such argument runs counter to the general principle that a condition precedent presupposes the existence of a *803 contract and not the converse, as MECO argues. Career Aviation Sales, Inc. v. Cohen, 952 S.W.2d 324, 326 (Mo.App.1997); Highland Inns Corp. v. American Landmark Corp., 650 S.W.2d 667 (Mo.App. 1983). See Morgan v. City of Rolla, 947 S.W.2d 837, 840 (Mo.App.1997) (holding a condition precedent is an act or event that must be performed or occur, after the contract has been formed, before the contract becomes effective). Under certain circumstances not implicated here, a condition precedent can qualify the very existence of a contract, such as when the terms of the offer or a statute impose a condition precedent upon the validity of a contract. See, e.g., Ware v. Allen, 128 U.S. 590, 9 S.Ct. 174, 32 L.Ed. 563 (1888); Kelley v. Illinois Central R. Co.. 352 Mo. 301, 177 S.W.2d 435 (1943); 13 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS, § 38.4 (4th ed.2000). However, that is not the situation here. As explained more fully in the paragraphs that follow, it was only the performances under the Main Contract that were conditioned on financing; consequently, we follow the general principle enunciated in Cohen and Highland. We reject any argument by MECO to the contrary.
Second, by arguing that the Main Contract was not "enforceable" until DBE released the financing contingency on September 29, 1993, MECO confuses contract obligation with contract performance. See Cohen, 952 S.W.2d at 326; Highland, 650 S.W.2d at 671. The Main Contract is akin to the contracts at issue in Cohen and Highland, which is to say it is one of bilateral terms, mutual promises for mutual performances. MECO promised to do "site preparation, parking lot paving, parking lot lighting, and construction of the Theater Building, complete." DBE made the concurrent promise to pay MECO the "Costs of the Work" as described in the Main Contract. "A return promise suffices as consideration for a promise." Cohen, 952 S.W.2d at 326. After execution of the Main Contract on August 25, 1993, the parties were obligated to each other to make the performances promised and neither could withdraw with impunity. See Cohen, 952 S.W.2d at 326; Highland, 650 S.W.2d at 671. The performances of theater construction by MECO and payments by DBE, promised in the Main Contract, were not immediate, but deferred. That, however, does not make the contract unenforceable as MECO contends. Deferring performances via a condition precedent does not affect the validity of the undertaking as a consummated and already enforceable contract. Cohen, 952 S.W.2d at 326; Highland, 650 S.W.2d at 672. Based on Cohen and Highland, we conclude that the condition here (DBE receiving financing) did not affect the validity of the Main Contract as an allocation of rights and obligations.
Having found that the Main Contract was a consummated and enforceable contract when executed on August 25, 1993, the question remains: Was the trial court compelled to find, as a matter of law, that the ten-day letter agreements formed contracts independent of the Main Contract, as MECO apparently contends? We answer, "No."
Generally, contracts may be modified as to particular provisions or have new terms engrafted thereon, yet stand as to the residue of the original agreement. Shutt v. Chris Kaye Plastics Corp., 962 S.W.2d 887, 890 (Mo.banc 1998); Cranor v. Jones Co., 921 S.W.2d 76, 81 (Mo.App.1996). Modification of a contract constitutes the making of a new contract which, like any other agreement, is enforceable only if based upon mutual assent and supported by consideration. Goldstein and Price v. Tonkin & Mondl, L.C., *804 974 S.W.2d 543, 551 (Mo.App.1998). Substitution of a modified contract for an unperformed old contract is sufficient consideration for the newly formed contract, provided the substituted agreement contains a change of obligation for each party. Barr v. Snyder, 294 S.W.2d 4, 9 (Mo.1956).
A "meeting of the minds," or "mutual assent," of all parties is essential to the formation of any contract, Karsch v. Carr, 807 S.W.2d 96, 99 (Mo.App.1990), including one formed by modification. Goldstein and Price, 974 S.W.2d at 551. Courts look to the parties' objective manifestations of intent to determine whether there was a "meeting of the minds." (Emphasis supplied). McDaniel v. Park Place Care Center, Inc., 918 S.W.2d 820, 827[15] (Mo.App.1996). "A person's subjective intent is irrelevant." Id.
Necessarily, we apply the foregoing principles in deciding if MECO and DBE, by their letter agreements, formed three independent and separate contracts or modified the Main Contract three times. Having done so, we find ample evidence to support the trial court's implicit finding that, by these ten-day letters, the parties mutually assented to modifications of the Main Contact, not three separate contracts. Such evidence is found in the letter agreements which (a) referenced MECO's "time schedules," (b) contained directives to "proceed with grading and work under the contract[,]" (c) authorized work to proceed "pursuant" to the Main Contract for three ten-day periods, (d) continued to defer all performances under the Main Contract except those described by the letter agreements, and (e) abrogated the Main Contract's financing contingency for work accomplished under the letter agreements. Even more compelling is evidence that MECO did not conduct itself as if the letter agreements were separate independent agreements. For instance, MECO labeled its November 4, 1993, billing as Invoice 2. Thereafter, it numbered monthly invoices in the same sequence. From such conduct, it is reasonable to infer that MECO viewed its October 4, 1993, billing as Invoice 1 under the Main Contract and its performances under the letter agreements as occurring under a modified Main Contract, not separate contracts. A similar inference can be drawn from mechanic's lien statements, filed by MECO, one dated August 30, 1994, and another dated October 11, 1994. Each statement included MECO's invoice sums for its September 1993 work and material. Also, these documents contained MECO's sworn statement that the mechanic's lien it sought was for labor and materials furnished "under one general contract," which was identified as the Main Contract. In addition, MECO's requests to extend the completion date beyond April 1, 1994, because of adverse weather, job site conditions, and building permit delays, consistently included September dates. If as MECO now contends, the September work was covered by separate contracts, there was no reason for MECO to request additional days for completion due to weather or other delays occurring before September 29, 1993. Testimony by MECO's corporate officers and employees about September 1993 events, such as, MECO's work on the theater site, efforts to obtain plans and specifications from the architect, ordering of steel for the theater, and subcontractor negotiations, supports the conclusion that MECO and DBE consistently viewed themselves as performing under the Main Contract in September 1993, not separate contracts. Further support for this conclusion is found in the testimony by Wayne Towe, president of MECO. When asked if MECO was able to start work on the Main Contract on September 1, 1993, Towe answered: "In essence, yes."
*805 In summary, ample evidence exists to support a finding that, by mutual assent, MECO and DBE modified the Main Contract by the three ten-day letter agreements. Earlier, we found the Main Contract not only came into existence but was consummated and enforceable upon its execution on August 25, 1993. Accordingly, MECO's failure to include the obligatory § 429.012.1 notice on its October 4, 1993, invoice precluded it from asserting a statutory lien against the DBE property. See Gauzy, 934 S.W.2d at 304-06; White River, 806 S.W.2d at 738. The trial court did not err in so finding. Point denied.
POINT II: AMBIGUITY AFFECTING SUBCONTRACTS' "PAY IF PAID" CLAUSE?
Subcontractors who entered this litigation to seek mechanics' liens against the theater property, judgments against MECO for breach of contract, and who remain as respondents on appeal, include Artisan Construction Services, Inc. ("Artisan"), Delvan Mitchell Ceiling Company ("Mitchell"), John O'Neal, d/b/a O'Neal Sheet Metal, Inc. ("O'Neal"), Table Rock Asphalt Construction Company, ("Table Rock"), and William J. Zickel Company ("Zickel").[3]
The trial court entered money judgments against MECO and for Subcontractors as follows: Artisan ($82,778.54), Mitchell ($34,062.22), O'Neal ($22,871.87), Table Rock ($151,759.28), and Zickel ($34,929.49). Additionally, the trial court imposed first and equal priority mechanics' liens against the theater property and in favor of Subcontractors for the foregoing amounts.
MECO's second point charges the trial court with reversible error for entering judgment against MECO on Subcontractors' breach of contract claims. In urging reversal, MECO relies on the "pay if paid" language in the contracts it signed with Subcontractors. Specifically, Article 2.1 of the subcontracts provided that Subcontractors should be paid in installments and, further, that
"[p]ayment of the approved portion of Subcontractor's Application for Payment shall be conditioned upon receipt by [MECO] of his payment from [DBE]. In the event, [DBE] does not make payment to [MECO] on the Application for payment submitted by Subcontractor, [MECO] is relieved and discharged herein from making payment to Subcontractor until payment is made."
Additionally, a final pay clause in the subcontracts (Article 2.4) recited that "Subcontractor shall be entitled to final payment upon approval by [DBE], Architect and [MECO] of Subcontractor's Work and upon final payment having been received by [MECO] for all of Subcontractor's Work. ..." (Emphasis supplied).
According to MECO, any "principled reading" of these provisions "will find [them] unambiguous" and as such, the clauses must be read as a condition precedent to MECO's obligation to pay. Continuing, MECO claims Subcontractors bore the burden of proving performance of the condition precedent, i.e., proving MECO had been paid by DBE for Subcontractors' work. Based on the premise that Subcontractors did not prove this condition precedent had been met, MECO urges reversal of the money judgments favorable to Subcontractors and against MECO.
In response, Subcontractors argue, inter alia, that inconsistent provisions in their agreements with MECO render the "pay if paid" clause ambiguous; consequently, they insist that such provision merely sets a reasonable time for MECO to pay and *806 does not create a condition precedent to payment. As authority for the latter proposition, Subcontractors rely most heavily on American Drilling v. City of Springfield, 614 S.W.2d 266 (Mo.App.1981).
The subcontract provision analyzed in American Drilling provided that "partial payments [from contractor] shall not become due to [subcontractor] until ten days after [contractor] receives payment for such work from [the owner]." 614 S.W.2d at 271-72 n. 7. This court rejected as "unsound" the contractor's argument that such provision meant the contractor was "not obligated, and cannot be expected, to pay any money to [subcontractor] until [contractor] has been paid an equal sum from [the owner]." Id. at 273. In doing so, we adopted what appears to be the majority view concerning such clauses, namely:
"A clause which provides that the contract shall pay a subcontractor within a stated number of days after the contractor has received payment from the owner merely fixes the time when the payment is due and does not establish a condition precedent to payment.
....
"In Midland [Engineering Co. v. John A. Hall Const. Co., 398 F.Supp. 981 (N.D.Ind.1975) ] it is said the clause is not intended to provide the contractor with an eternal excuse for nonpayment. Peacock [Const. Co. v. Modern Air Conditioning, Inc., 353 So.2d 840 (Fla. 1977) ] points out that the subcontractor will not ordinarily assume the risk of the owner's failure to pay the general contractor and in order for that risk to be shifted to the contractor, the clause must unambiguously express that intention."
Id. at 273 (emphasis supplied).
As written, American Drilling is authority for the proposition that if a "pay if paid" provision is clear and unambiguous, it will be interpreted as setting a condition precedent to the general contractor's obligation to pay. Conversely, if such a provision is ambiguous, it will be interpreted as fixing a reasonable time for the general contractor to pay.[4]American Drilling also teaches, at least inferentially, that when a general contractor puts a risk-shifting provision in a subcontract, the burden of clear expression is on the general contractor. See Graue v. Missouri Property Ins. Placement Facility, 847 S.W.2d 779, 785[20] (Mo.banc 1993) (holding an ambiguous contract will be construed against the party drafting the same); DEC Elec., Inc. v. Raphael Const. Corp., 558 So.2d 427, 429 (Fla.1990).
Here, Subcontractors' principal claim of "pay if paid" ambiguity is based on clauses found in the Main Contract and accompanying general conditions between MECO and DBE. Subcontractors insist any subcontract analysis must include consideration of provisions in the Main Contract, including its general conditions, because they were expressly included as part of Subcontractors' agreements with MECO.[5] We agree. Writings made a *807 part of a contract by annexation or reference are to be considered in deciding if it is ambiguous. J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264[8] (Mo.banc 1973).
The Main Contract between MECO and DBE was a "COST OF THE WORK PLUS A FEE" type of contract that required MECO to pay its subcontractors before DBE reimbursed MECO.[6] Any doubt that the Main Contract required MECO pay Subcontractors before DBE paid MECO is removed by the General Conditions. Article 9.10.2 thereof required MECO to submit an affidavit certifying that Subcontractors had been paid before final payment from DBE became due.[7] In contrast to these Main Contract provisions, Articles 2.1 and 2.4 of the subcontracts purport to require payment from DBE to MECO as a condition precedent to final payment becoming due to Subcontractors. The direct conflict between the subcontracts and the Main Contract (including the General Conditions section) creates, at a minimum, an ambiguity regarding who must bear the risk of DBE's nonpayment.
In reaching our conclusion, we rely heavily on OBS Company Inc. v. Pace Construction Corp., 558 So.2d 404 (Fla. 1990). The "pay if paid" clause in the Pace subcontract differed from the ones here to the extent it used the term, "conditions precedent." Id. at 405. Otherwise, the Pace subcontract was similar as it incorporated and referenced all Owner/Contractor agreements, including general conditions. Id. at 406 n. 1. Also, the Owner/Contractor agreement in Pace had language which, as here, obligated the contractor to pay the subcontractor before the owner reimbursed the contractor. Id. at 406 n. 2, 3. Because of the conflict, the Pace court concluded that "when [the pay if paid] provision ... of the subcontract is read in conjunction with the general contract and conditions, ambiguity exists and prevents the provision from effectively shifting the risk of the owner's nonpayment from [the contractor] to [the subcontractor.]" Id. at 407. Pace is factually akin to this case in most material respects. We find the Pace court's reasoning persuasive and in keeping with the teaching of American Drilling.
*808 In so stating, we do not ignore MECO's claim that a clause in its subcontracts, but allegedly not in the Pace subcontract, makes Pace inappositive. Specifically, MECO points to this proviso at the end of Article 1.2 of its subcontracts: "Provided, however, to the extent that any provision of the [Main] Contract is inconsistent with any provision of this [Subcontract], this [Subcontract] shall govern." See note 8. MECO argues that this "supremacy" clause "becomes a part of both the Main Contract and the Subcontract, for each contract expressly includes the other." Continuing, it asserts: "The net effect is that if there truly was a conflict on anything, the subcontract prevails and removes any ambiguity."[8]
This argument fails, however, as it ignores the fact that Article 1.1 of the Main Contract similarly purports to ascribe superiority to its provisions. Specifically, Article 1.1 of the Main Contract provides, inter alia: "If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern." Thus, what MECO characterizes as a "supremacy clause" in Article 1.2 of its subcontracts is countermanded by a similar "supremacy clause" in Article 1.1 of the Main Contract. Because of the supremacy clause in Article 1.1 of the Main Contract, any attempted resolution of the conflict between the two contracts by resort to the supremacy clause in article 1.2 of the subcontracts results in a circuitous analysis which settles nothing. We reject MECO's arguments to the contrary.
There is no dispute that MECO prepared and provided the subcontract agreements. Consequently, the burden of clear and unambiguous expression of the risk-shifting provision was on MECO. Graue, 847 S.W.2d at 785; DEC Elec., 558 So.2d at 429. Because MECO has not met that burden, the "pay if paid" provision must be construed as establishing a reasonable time to pay by MECO rather than creating a condition precedent to MECO's obligation to pay Subcontractors. See American Drilling, 614 S.W.2d at 273. MECO remains liable for the final payments owed Subcontractors. The trial court did not err in rendering judgments for Subcontractors against MECO. Point II is denied.
POINT III: MECO'S SUBROGATION RIGHTS TO SUBCONTRACTORS' LIENS?
MECO's third point complains the trial court erred when it failed to invoke the equitable principle of "subrogation" and declare that, to the extent MECO pays Subcontractors, either voluntarily or involutarily, MECO should be entitled to the security held by Subcontractors, mainly, the Subcontractors' mechanics' liens. Stated otherwise, MECO charges the trial court erred when it failed to "award MECO a right of subrogation against the Subs mechanic's lien against the property."
In developing this point, MECO argues that § 429.270, RSMo 1994, and case law interpretations thereof make it clear that mechanics' lien cases are proceedings in equity in every sense of the word and for every purpose, including application of the equitable doctrine of subrogation. See, e.g., Huggins v. Hill, 236 S.W. 1051 (Mo. banc 1921) (holding mechanic's lien action is equitable, not only because the statute so denominates it, but is equitable in substance). MECO then cites Cole v. Morris, 409 S.W.2d 668 (Mo.1966), a workers' compensation case, to explain the equitable nature of subrogation:

*809 "Subrogation is founded on principles of justice and equity, and its operation is governed by principles of equity.... It has been said that ` * * * the right of subrogation * * * is a device adopted or invented by equity to compel the ultimate discharge of a debt or obligation by the one who in fairness and good conscience ought to pay it. Though the doctrine is equitable in its origin, the right acquired is generally referred to as legal subrogation; * * *' Legal subrogation arises by operation of law where a person having a liability * * * in the premises pays a debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditors whom he has paid."
Id. at 670 (citations omitted).
Based on the Cole court's analysis of subrogation law and the equitable nature of mechanics' lien suits, MECO urges remand of this case with directions to the trial court to transfer Subcontractors' mechanics' liens to MECO as a way to repay MECO "whatever amount it may be required to pay out under its appeal bond."
In response, Empire Bank argues, inter alia, that MECO's claim of entitlement to be subrogated to Subcontractors' mechanics' liens is moot. We agree. This conclusion stems from the fact that Subcontractors released their liens during the pendency of this appeal; consequently, Subcontractors no longer have an existing right or legal claim that can be subrogated to fulfill MECO's claim.[9] It is fundamental that "in order to achieve subrogation, the subrogor [Subcontractors], must have some existing right or legal claim that can be subrogated to fulfill the claim of the subrogee [MECO]." Estate of Griffitts, 938 S.W.2d 621, 624 (Mo.App. 1997). Once Subcontractors released their mechanics' liens, nothing remained for MECO to be subrogated to; consequently, any discussion of the subrogation issue could only be advisory. "Appellate courts do not render advisory opinions or decide nonexistent issues." Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d 419, 427 (Mo. App.1999).
When, as here, the question presented for decision cannot have any practical effect upon any existing controversy, the question is moot. Bank of Washington v. McAuliffe, 676 S.W.2d 483, 487[5] (Mo.banc 1984). Subcontractors' release of their liens is an intervening event which makes it unnecessary for us to address MECO's third point. This follows because MECO's third point no longer represents an actual controversy.[10] *810 POINT IV: LIQUIDATED DAMAGES; WHEN DID WORK START UNDER CONTRACT?
The Amendment set April 1, 1994, as the "Substantial Completion" date for this project and required MECO to pay $5,000 per day as liquidated damages for each day of delay beyond April 1. However, the Amendment also provided if the "date of commencement [was] later than September 1, 1993, the substantial completion date [would] be extended by an equal number of days corresponding to the delay in the date of commencement."
At trial, the parties stipulated that "substantial completion" was achieved May 30, 1994. Because this occurred after April 1, 1994, DBE sought liquidated damages per the contract.
MECO defended on two grounds. First, MECO asserted that the first work performed under the Main Contract never occurred until the financing contingency was released on September 29, 1993; accordingly, MECO argued the completion date should be extended to April 29, 1994. Second, MECO argued the substantial completion date should be pushed back even further due to adverse weather, job site conditions beyond MECO's control, and building permit delays.
The trial court rejected MECO's first argument and found MECO commenced work under the Main Contract September 1, 1993, not September 29, 1993. Second, the court found MECO was entitled to forty-five extra days, or until May 16, 1994, to complete the project due to delays caused by inclement weather, lack of building permit, and site conditions over which MECO had no control. Accordingly, the court awarded DBE $75,000 liquidated damages, i.e., 15 days × $5,000 per day.
On appeal, MECO's fourth point reprises MECO's earlier arguments that MECO never started to work under the Main Contract until September 29, 1993; consequently, the revised completion date came after May 30, 1994, i.e., April 29, 1994, plus forty-five days. Accordingly, MECO insists the court committed reversible error in awarding liquidated damages.
The premise of this argument that MECO never started work under the Main Contract until the financing contingency was satisfied, was fully addressed and decided adversely to MECO under Point I. Further discussion is not required. Point IV is denied.
POINT V: MECO'S CLAIM OF ENTITLEMENT TO EQUITABLE LIEN
In its fifth point, MECO contends the trial court erred when it (a) denied MECO's claim against DBE based on unjust enrichment principles, and (b) failed to impose an equitable lien against the theater property to secure the judgment for unjust enrichment. MECO insists the equitable tenet undergirding §§ 429.270-280 and the circumstances revealed by this record mandate a judgment against DBE on MECO's unjust enrichment count "in the amount which MECO was required to pay its Subs ... secured by an equitable lien against the theatre property with the same priority as the mechanic's liens given to MECO's Subs."
MECO's claim of entitlement to judgment on its unjust enrichment count ignores the well-settled rule in Missouri that a party cannot be compensated *811 for the same injury twice. Stiffelman v. Abrams, 655 S.W.2d 522, 533 (Mo.banc 1983). This is true whether the injury arises out of contract or tort. Ross v. Holton, 640 S.W.2d 166, 173 (Mo.App. 1982). Quoting 25 C.J.S. Damages § 3, pp. 627-28, the court in Weeks-Maxwell Const. Co. v. Belger Cartage Serv., 409 S.W.2d 792, 796 (Mo.App.1966) said:
"As a general rule, a person who has sustained loss or injury may receive no more than just compensation for the loss or injury sustained. He is not entitled to be made more than whole, and he may not recover from all sources an amount in excess of the damages sustained, or be put in a better condition than he would have been had the wrong not been committed."
Here, MECO proceeded as the appellant did in Baker v. Wade, 949 S.W.2d 199 (Mo.App.1997), that is, MECO did not elect a remedy before the case was submitted to the trial judge, but rather submitted both the breach of contract and unjust enrichment counts to the judge. By its failure to select a remedy, MECO left that choice to the trial judge. The judge then selected a remedy by entering a judgment favorable to MECO on the contract count and denying MECO's unjust enrichment claim. Id. at 202. Having failed to take reasonable steps to elect a remedy before submission, MECO cannot now complain about the trial court's choice of a remedy, especially since it left unappealed the judgment on the contract count. Id.
MECO concedes in its brief that the judgment for MECO and against DBE on the breach of contract count included the sums yet owed by MECO to Subcontractors. Consequently, to also award MECO those amounts under the unjust enrichment count as MECO urges, runs afoul of Missouri's rule against double compensation for the same injury. See Fidelity Nat. Title v. Tri-Lakes Title, 968 S.W.2d 727, 733-34 (Mo.App.1998). This is true even though the final judgment against DBE on the contract count may be wholly insufficient to cover its actual damages because of DBE's bankruptcy filing.
"As a general rule the prosecution of one remedial right to judgment or decree, whether the judgment or decree is for or against plaintiff, is a decisive act which constitutes a conclusive election.... The rule is the same, even though the suitor fails to secure satisfaction by means of the remedy adopted, or has misjudged the effect of his first election."
Powell v. Schultz, 118 S.W.2d 25, 30 (Mo. App.1938) (quoting 20 C.J., § 19, p. 28). Although Powell involved adoption of a remedy by a litigant, rather than by the court, we see no meaningful distinction. Since MECO forced the trial judge to select a remedy, it cannot now complain the selected remedy was insufficient to cover its actual damages. Id.
As to MECO's claim that the trial court erred by not imposing an equitable lien on the theater property in MECO's favor, we reject it for several reasons. The first and foremost of the reasons is that MECO never sought an equitable lien via its pleadings, never requested an equitable lien at trial via witnesses or request of counsel, and failed to present any evidence on at least one of the elements of an equitable lien.
"The doctrine of `equitable lien' applies only in cases where the law fails to give relief and justice would suffer without the equitable remedy, but the doctrine has prescribed boundaries and generally there must be an express agreement, or conduct or dealings of the parties from which an intention may be implied, that some specific property shall be appropriated as security for a debt ... before equity will consider that *812 a lien should be declared on the property.
"An equitable lien cannot be based on moral obligations alone but must rest on established equitable principles, and a failure to repay money as agreed, standing alone, is not sufficient reason for equity to intervene to declare an equitable lien."
Wilkinson v.. Tarwater, 393 S.W.2d 538, 542 (Mo.1965) (citations omitted) (emphasis supplied).
MECO relies heavily upon Willman v. Beheler, 499 S.W.2d 770 (Mo.1973), and Miller v. Heisler, 187 S.W.2d 485 (Mo.App. 1945), to support its claim of entitlement to an equitable lien. However, in Miller the plaintiffs clearly presented the equitable lien issue to the trial court by their pleadings. Id. at 486. No such pleading exists in this case. In Willman, the court observed that "[o]nce having acquired jurisdiction equity will retain it, under a prayer for general relief (there was such a prayer in this petition), to administer full and complete justice, within the scope of the pleadings and evidence, between the parties." 499 S.W.2d at 778. There are, however, two reasons why Willman does not aid MECO. First, MECO's only prayer for general equitable relief is found in its unjust enrichment count. We explained earlier in this point why the trial court did not err in ruling the unjust enrichment count against MECO. Second, and more fundamental, MECO adduced no evidence from which the trial court could have found an essential element of equitable estoppel, either an express agreement between MECO and DBE that the theater property was to serve as security for DBE's debt to MECO, or conduct or dealing between DBE and MECO from which such an intention could be implied. To the contrary, DBE vigorously resisted MECO's efforts to have its judgment against DBE secured by a lien. Under the circumstances, MECO is urging this court to convict the trial court of an issue which was not put before it to decide, either by pleadings, evidence, or oral request at trial. This we will not do. See In re Marriage of Wormington, 957 S.W.2d 812 (Mo.App.1997); Boatmen's Bank v. Foster, 878 S.W.2d 506 (Mo.App.1994).
Finally, we note that MECO's ability to obtain a mechanic's lien on the theater property precluded it from obtaining an equitable lien. Campbell v. Rickert, 938 S.W.2d 282, 286 (Mo.App.1997). MECO cites no authority for the proposition that due to its failure to comply with the statute, it is entitled to an equitable lien. Campbell teaches that unless a lien applicant demonstrates its inability to obtain a mechanic's lien despite compliance with the statute, a trial court does not err in denying its request for an equitable lien. Id. Point denied.
The judgment is affirmed.
PREWITT, J., and BARNEY, C.J., concur.
PARRISH, P.J., and MONTGOMERY, J., recuse.
NOTES
[1] Until January 1, 2000, Rule 73.01(c) prescribed the standard of review for Missouri's appellate courts; now the standard is found in Rule 84.13(d). All other rule references are to Supreme Court Rules (2001).
[2] All statute refererences are to Revised Statutes of Missouri, Cum.Supp.1993, unless otherwise indicated.
[3] When referring to subcontractors collectively, we call them "Subcontractors."
[4] Implicitly, American Drilling recognizes that the law does not favor conditions precedent, and courts will only construe contract provisions to be such when required to do so by plain and unambiguous language. Kansas City Southern Ry. Co. v. St. Louis-S.F.Ry. Co., 509 S.W.2d 457, 460 (Mo.1974); Juengel Const. Co., Inc. v. Mt. Etna, Inc., 622 S.W.2d 510, 513-14 (Mo.App.1981).
[5] Article 1.2 of each subcontract provides, inter alia:

"The Contract Documents shall ... include the Prime Contract consisting of the [Main Contract] between [DBE] and [MECO], and the other contract documents enumerated therein, including Conditions of the Contract (general, supplemental and other conditions), drawings, specifications and addenda issued prior to execution of this Agreement.... These documents ... are as fully a part of this Agreement as if attached to this Agreement or repeated herein. Subcontractor agrees to be bound to Contractor by the terms of this Subcontract Agreement and the [Main Contract] referred to and identified herein; and to the extent that the provisions of the [Main Contract] applies to the Work of the Subcontractor hereunder, to assume all of the obligations, duties and responsibilities which Contractor, by the [Main Contract], assumes with [DBE] ..., provided, however, to the extent that any provision of the [Main Contract] is inconsistent with any provision of this Agreement, this Agreement shall govern." (Emphasis supplied).
[6] Article 5.1. requires "[DBE] ... pay [MECO] ... for [MECO's] performance of the Contract the Contract Sum consisting of the Cost of the Work as defined in Article 7 and [MECO's] Fee...." Article 7.1 defines the cost of work as those "costs necessarily incurred by [MECO] in the proper performance of the Work[,]" whereas Article 7.1.2 states that such costs shall include "[p]ayments made by [MECO] to Subcontractors in accordance with the requirements of the subcontracts." (Emphasis supplied).
[7] Article 9.10.2 of the general conditions provides in pertinent part:

"Neither final payment nor any remaining retained percentage shall become due until [MECO] submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment and other indebtedness connected with the Work for which [DBE] or [DBE's] property might be responsible or encumbered (less amounts withheld by [DBE] ) have been paid or otherwise satisfied." (Emphasis supplied).
[8] We note that, contrary to MECO's assertion, the Pace opinion provides no clue as to whether the so-called supremacy clause was or was not in the Pace subcontract.
[9] Subcontractors inform us via their reply briefs that they have released their mechanics' liens on the theater property during the pendency of this appeal. Empire confirms this by attaching copies of the releases to its brief. To determine if an issue presented on appeal is moot, "an appellate court can look outside the record." Kracman v. Ozark Elec. Co-op., Inc., 816 S.W.2d 688, 690 (Mo.App. 1991).
[10] In its reply brief, MECO charges that "through ... post-judgment maneuvering," Empire is attempting to thwart MECO's "obvious right of subrogation." Without explicitly saying so, MECO apparently suggests this court can and should order reinstatement of Subcontractors' mechanics' liens and then transfer those liens to MECO based on principles of subrogation. MECO urges such action as a means of doing "equity" and avoiding the unjust enrichment of Empire, but does so without citing on-point authority or explaining its absence. Without addressing what are arguably unsound premises, i.e., that MECO was "obviously" entitled to subrogation and that we have authority to reinstate the liens, we note that the office of equity is to supply defects in the law. Donovan v. Kansas City, 175 S.W.2d 874, 884[18] (Mo.banc 1943). Section 429.170 authorizes assignment of mechanics' liens. Consequently, MECO could have paid Subcontractors and received from them an assignment of their liens. Having opted to stand on the "pay if paid" clauses in their subcontracts, MECO's argument that the trial court should be convicted of error for not awarding it subrogation rights rings hollow, especially since MECO never pled entitlement thereto, nor did it orally request such relief at trial. We continue in the belief that the subrogation issue is now moot.